STATE of Wisconsin, Plaintiff-Respondent,

v.

Charles R. BURNS, Defendant-Appellant.

Supreme Court

*No. 82–210–CR. Argued February 4, 1983.—Decided April 26, 1983.*

(Also reported in 332 N.W.2d 757.)

For the defendant-appellant there were briefs and oral argument by *Steven D. Phillips,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Jeffrey M. Gabrysiak,* assistant attorney general, with

whom on the briefs were *Bronson C. La Follette,* attorney general, and *Pamela Magee-Heilprin,* assistant attorney general.

DAY, J.   This is an appeal from a judgment of conviction entered in the circuit court for Kenosha county, Thomas P. Corbett, Reserve Judge. The defendant, Charles R. Burns, appealed from the judgment. The court of appeals certified the case to this court pursuant to sec. (rule) 809.61, Stats. 1979–80. The certification request was granted on December 6, 1982.

There are two issues on appeal. The first is: Did the testimony of a physician given three months before trial furnish a sufficient basis for the trial judge in the exercise of his discretion to declare a sexual-assault-victim witness unavailable for trial and to permit introduction into evidence of her testimony given at the preliminary hearing?

The physician testified at a hearing on the unavailability issue that subsequent to the preliminary hearing the victim developed a severe mental illness as a result of the assault which illness would last for a minimum of two years and that requiring her to testify presented a high probability of causing a moderate to severe relapse.

The second issue is: Did the admission of such preliminary hearing testimony violate the confrontation clauses of the state or federal constitutions?

We conclude the trial court did not abuse its discretion in ruling that the victim was unavailable to testify at trial. We also conclude that there was no violation of the confrontation clause of the state or federal constitution. Thus, the transcript of her preliminary hearing testimony was properly admitted into evidence and we affirm the judgment of the trial court.

On June 18, 1980, an information was filed against the defendant charging him with one count of first-degree sexual assault contrary to sec. 940.225(1)(b), Stats.

1979–80,[1] one count of endangering safety by conduct regardless of life contrary to sec. 941.30,[2] one count of kidnapping contrary to sec. 940.31(1)(a),[3] one of robbery contrary to sec. 943.32(1)(a),[4] and one count of verbally threatening to injure another contrary to sec. 943.30(1).[5]

[1] "940.225 **Sexual assault.** (1) FIRST DEGREE SEXUAL ASSAULT. Whoever does any of the following is guilty of a Class B felony: . . .

"(b) Has sexual contact or sexual intercourse with another person without consent of that person by use or threat of use of a dangerous weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a dangerous weapon."

[2] "941.30 **Endangering safety by conduct regardless of life.** Whoever endangers another's safety by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, is guilty of a Class D felony."

[3] "940.31 **Kidnapping.** (1) Whoever does any of the following is guilty of a Class B felony:

"(a) By force of threat of imminent force carries another from one place to another without his consent and with intent to cause him to be secretly confined or imprisoned or to be carried out of this state or to be held to service against his will; or. . ."

[4] 943.32 **Robbery.** (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means is guilty of a Class C felony:

"(a) By using force against the person of the owner with intent thereby to overcome his physical resistance or physical power of resistance to the taking or carrying away of the property; or. . ."

[5] "943.30 **Threats to injure or accuse of crime.** (1) Whoever, either verbally or by any written or printed communication, maliciously threatens to accuse or accuses another of any crime or offense, or threatens or commits any injury to the person, property, business, profession, calling or trade, or the profits and income of any business, profession, calling or trade of another, with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do any act against the person's will or omit to do any lawful act, is guilty of a Class D felony."

These charges arose from separate incidents which occurred on May 6, 1980, involving two women, M.S. and L.L. The kidnapping charge resulted from the abduction of M.S. from an apartment building parking lot in the township of Somers in Kenosha county early on the morning of May 6th. M.S. was forced at gunpoint to drive away from the parking area. The gunman directed her to drive to another parking lot. In that lot, M.S. managed to escape from her abductor by ramming her car into a set of garbage cans, fleeing from her car and screaming for help. She later identified the defendant as her abductor.

The defendant challenged the conviction for the kidnapping of M.S. on the basis that the L.L. preliminary testimony "reinforced" M.S.'s identification testimony and if L.L.'s preliminary testimony was rejected by this court, a new trial should be granted defendant on the kidnapping conviction. Because we hold L.L.'s preliminary testimony was properly admitted, there is no basis for the defendant's claim for a new trial on the kidnapping charge. The kidnapping conviction is therefore affirmed.

The incident giving rise to the other charges occurred on the evening of May 6. According to the preliminary hearing testimony of the victim, L.L., on that evening she had gone to a restaurant in the city of Kenosha. She had left the restaurant and went to her car in a parking lot when a person, who she later identified as the defendant, came up to her, pulled out a gun, and forced her into her car. He forced her to drive to a secluded area.

Once parked, the defendant forced L.L. into the back seat of the car where he beat her with the gun. He struck her at least three times in the face with the gun and ordered her to take her clothes off. He put the gun to her head and pulled the trigger. She heard the gun

click. He told her she was "lucky" and cocked the gun again. She was bleeding from her face. She testified, "I realized . . . I was going to die . . . and I started screaming out Jesus Christ, Jesus Christ, Jesus Christ because I was just totally . . . petrified."

The defendant proceeded to force L.L. to remove her clothes. When she refused to do so, he ripped them off. He then began to touch her breasts and genital area with his hands and penis but penetration never occurred.

Following the sexual assault, the defendant demanded that L.L. turn over the money in her purse to him. She did so. The defendant then took out a wire and began to choke her. She passed out. She thought she was dead. She came to and the defendant began to choke her with the wire again. Again she lost consciousness.

When L.L. came to, she found the defendant was beating her on the head with the gun and she testified "blood started squirting out." The defendant then picked her up and threw her against the car window. He then told her that he had looked in her wallet and knew who she was, and, if she said anything about the attack, he would get her. He then left the car.

L.L. realized she was bleeding profusely and needed medical attention. She walked from the car (the defendant had taken the car keys during the assault) and sought help. She ultimately made her way to a house and the sheriff's department was called.

L.L. identified the defendant as her assailant. The defendant was arrested. A preliminary hearing was held on May 22, 1980, at which L.L. testified to the facts set out above. She was extensively cross-examined on her testimony at the preliminary hearing by counsel for the defendant.

As the trial date approached, the prosecutor attempted to produce L.L. for the purpose of complying with discovery demands and chemical testing. She refused stat-

ing that she had forgiven the defendant. The prosecutor then made arrangements to have her arrested and extradited as a material witness. This attempt was halted, however, when the prosecutor learned that L.L. was suffering from severe psychological problems and had been hospitalized because of them.

On December 5, 1980, the prosecutor made a motion to declare L.L. unavailable for trial. On December 9, 1980, a hearing was held on the motion. Doctor David F. Busby, a specialist in forensic psychiatry, testified at the hearing. He treated L.L. during her stay in the psychiatric ward of Lutheran General Hospital in Park Ridge, Illinois.

Dr. Busby testified that at the time of L.L.'s admission to the hospital, she was undernourished and in a "catatonic stupor with hallucinations and delusions." She would "stand in one spot and talk to the wall, refuse to eat, refuse to dress or undress, refused all medication [and] refused all communication. . . ."

Because of a hospital policy allowing only a one month stay, she left the hospital a month later. Dr. Busby recommended transfer to another facility but L.L.'s parents believed they could care for her better at home. At the time L.L. left the hospital, Dr. Busby estimated that she was "ten to twenty percent improved."

Dr. Busby testified that L.L. suffered from schizophrenia and might be expected to "improve over the X number of years, maybe two or three, maybe five or ten . . . ."[6] It was Dr. Busby's opinion that forcing L.L.

---

[6] In the record, Dr. Busby initially testified that L.L. suffered from schizophrenia. He later identified the disorder as an acute schizophreniform disorder. However, the record clearly shows that he expected the recovery period to last a minimum of two years and such a recovery period is consistent with a diagnosis of schizophrenia but not acute schizophreniform disorder. *See Diagnostic and Statistical Manual of Mental Disorders* (3rd Ed. 1980).

to testify at trial had a "high probability [of causing] anywhere from a moderate to substantial relapse and return of [L.L.'s] symptoms. . . ."

Dr. Busby also testified that he had been involved in treating patients who had been traumatized by sexual assaults and that in none of the other cases had there been this "extreme degree of reaction."

Dr. Busby's testimony was based on his personal observations of L.L. up until her discharge from the hospital on October 18, 1980, and on subsequent conversations with her parents up until the time of the hearing. However, he noted at the hearing that his prognosis for future improvement was based in part on the condition L.L. was in when she left the hospital and on the lack of progress that had been reported to him by her parents since her discharge from the hospital. He also commented on the nature of schizophrenia and the fact that the disorder was "notable for its difficulty in recovery. . . ."

An additional hearing on the motion was held on January 16, 1981. At that hearing the defendant testified that L.L. had visited him in jail since the time of the last hearing. The defendant produced a letter from L.L. to the defendant in which she asked him to "accept the Lord Jesus into your life," and urged him to read the Bible. She also expressed the hope that "we are friends in Jesus Christ." The defense also had a note from L.L. to the defendant asking him to put her on a list of visitors permitted to visit him at the jail.

The judge, William Zievers, received the testimony and exhibits but made clear that he did not "see where they bear upon the issue before the court." He stressed that the testimony and exhibits "neither adds nor detracts from the testimony offered by the professional who based his opinion and expressions of prognosis on his professional contacts with the witness. . . ."

Following the hearing, the judge ruled that L.L. was unavailable to testify at trial within the meaning of sec. 908.04(1)(d), Stats. 1979–80.[7]

On February 23, 1981, the state filed a motion in limine to prohibit the defendant from offering evidence of any and all contact between L.L. and the defendant. For reasons not disclosed in the record, Reserve Judge Thomas Corbett, was substituted for Judge Zievers and held a hearing on the motion. At the hearing, Judge Corbett made the following statement summarizing his position on the availability question:

"Mr. Bramscher [the defense attorney] has indicated that it is his intention at this time to confer with the parents of this girl prior to making any determination as to whether or not he wishes her to be in attendance at the trial and that he will advise the Court and Counsel of his intention to present her at trial prior to doing so. The Court has indicated that if that situation comes up, it will conduct a hearing outside the presence of the jury for the purpose of determining the appropriateness of her testifying."

Following the hearing, the state's motion was granted.

The defendant never attempted to produce L.L. at trial. At trial Judge Corbett reiterated that he had agreed to hold a hearing on the unavailability question if the defendant wished to challenge Judge Ziever's ruling. However, Judge Corbett made it clear that the initial ruling was appropriate and would stand because the defendant had failed to demonstrate that the initial determination of unavailability should not continue to apply up to the time of trial. The defendant introduced no testimony

---

[7] "908.04 **Hearsay exceptions; declarant unavailable; definition of unavailability.** (1) 'Unavailability as a witness' includes situations in which the declarant: . . .

"(d) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or . . ."

from professionals to show L.L. no longer suffered from a severe mental illness but rather relied upon statements from the defendant and his father as to their impressions arising from contacts with L.L. Judge Corbett found this testimony to be insufficient to require a change in Judge Ziever's determination that L.L. was unavailable for trial.

The defendant was tried and convicted on all five counts. The defendant appealed from the judgment.

The first issue is whether Judge Corbett abused his discretion in admitting L.L.'s preliminary hearing testimony into evidence at trial.

Under sec. 908.045(1), Stats. 1979–80, testimony given by a witness at a preliminary hearing may be admitted into evidence at trial under an exception to the hearsay rule if the declarant is unavailable as a witness. Section 908.04(1)(d) defines unavailability of a witness to include situations where the declarant is "unable to . . . testify at the hearing because of . . . then existing physical or mental illness or infirmity. . . ."

[1]

Under the statutes, for L.L.'s preliminary hearing testimony to be admitted, the state had to demonstrate that she suffered from a "then existing . . . mental illness" which made her unavailable to testify at trial. The trial court's decision on the admissibility of former testimony is a matter of discretion and will not be overturned unless an abuse of discretion is found. *State v. La Fernier,* 44 Wis. 2d 440, 446, 171 N.W.2d 408 (1969); *La Barge v. State,* 74 Wis. 2d 327, 338–339, 246 N.W.2d 794 (1976). We find no abuse of discretion here.

Judge Ziever's initial ruling was well supported by the testimony of an expert in forensic psychiatry. Dr. Busby testified that L.L. presently suffered from schizophrenia, a severe mental illness, and would continue to suffer from the illness for two years or more. He also

testified that requiring L.L. to testify at trial had a moderate to high probability of causing her to suffer a relapse. The symptoms L.L. originally suffered included being in a "catatonic stupor with hallucinations and delusions." He further testified that schizophrenia was known for the difficulty which patients experienced in recovering from it.

The defendant presented only his own testimony regarding his contacts with L.L. to support his position that she was available for trial. Based upon all of the testimony and exhibits taken at the motion hearing, a determination that L.L. presently suffered from a mental illness and would continue to so suffer through the trial date was amply supported by the evidence and did not constitute an abuse of discretion.

The defendant argues that, even if Judge Zievers did not abuse his discretion in determining L.L. to be unavailable, Judge Corbett erred because he never made an express finding that L.L. suffered from a then existing mental illness which made her unavailable for trial. The defendant contends that Judge Corbett should not have accepted Judge Ziever's ruling but rather should have conducted another hearing. At that new hearing, the burden would once again be on the state to show L.L.'s unavailability.

We disagree with the defendant's arguments. This situation arose solely because Judge Corbett was substituted for Judge Zievers at a mid-point in the process. Had Judge Zievers continued on through the trial, as we noted earlier, his ruling that L.L. was unavailable would not have constituted an abuse of discretion. Judge Zievers clearly ruled that L.L. would be unavailable as a witness at trial. Thus, a completely new determination of unavailability would not have to be made by Judge Zievers had he been the trial judge. Simply because Judge Cor-

bett was substituted for Judge Zievers does not require that the entire procedure be repeated. Judge Corbett properly exercised his discretion in view of the record in upholding the ruling of Judge Zievers.

Under sec. 908.045 (1), stats., L.L.'s preliminary hearing testimony was properly admitted at trial.

The second issue is whether the confrontation clauses of the state or federal constitutions were violated by the use of L.L.'s preliminary hearing testimony.

Even if the unavailability requirement is met so that the former testimony will not be excluded under the hearsay rule, for that testimony to be admitted it must also satisfy the requirements of both the federal[8] and Wisconsin[9] Constitutions. The defendant concedes in his brief that if the circumstances of this case demonstrate the unavailability of L.L. for trial, the use of the preliminary hearing testimony would not violate either state or federal constitutional requirements. *See, Ohio v. Roberts,* 448 U.S. 56 (1980) ; *Nabbelfeld v. State,* 83 Wis. 2d 515, 552, 266 N.W.2d 292 (1978) ; *State v. Bauer,* 109 Wis. 2d 204, 222, 325 N.W.2d 857 (1982) ; *State v. Dorcey,* 103 Wis. 2d 352, 307 N.W.2d 612 (1981).

The United States Supreme Court has not considered the question of when, under the federal constitution, the mental illness of a person is such that it renders a declarant unavailable. However, the Court has noted that, " 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' " *Roberts,* 448 U.S. at 74, citing *California v. Green,* 399 U.S. 149, 189, n. 22 (concurring opinion) (1970).

While the issue in *Roberts* concerned whether the state had made good-faith efforts to procure the physical pres-

[8] United States Constitution, Sixth Amendment. The confrontation was made applicable to the states in *Pointer v. Texas,* 380 U.S. 400 (1965).

[9] Wisconsin Constitution, Article I, section 7: "[T]he accused shall enjoy the right . . . to meet the witnesses face-to-face. . . ."

ence of an out-of-state declarant, that does not diminish the standard of reasonableness which the Court set for state actions necessary to present witnesses for trial. The state must act reasonably in attempting to produce a witness for trial.

Here, it is not the effort of the state to produce the physical presence of the witness that is in question. Rather, it is a question of whether the state should be required to produce a witness for trial who suffers from a severe mental illness which may be worsened if she is forced to testify at trial. In answering this question, we may appropriately consider the effect such a requirement might have on the criminal justice system for the Supreme Court has stated that "the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi,* 410 U.S. 284, 295 (1973).

The legislature has acted in Chapters 949 and 950 of the statutes to provide certain rights for victims of and witnesses to crimes. In sec. 950.01, Stats. 1981–82, the legislature declared its intent to "ensure that all victims . . . of crime are treated with dignity, respect, . . . and sensitivity; and that the rights extended to victims . . . of crime are honored and protected by law enforcement agencies, prosecutors and judges in a manner no less vigorous than the protection afforded criminal defendants."

The language quoted above is indicative of a widely held societal concern that the criminal justice system too often tramples upon the victims of crime in an effort to do "justice" for the perpetrators of such crimes. Such a perception would surely be reinforced if the system required a repetition of testimony from one who has already testified and been cross-examined even at the risk of doing substantial damage to her mental health.

For the criminal trial system to function efficiently and effectively, the cooperation of victims and witnesses is necessary. We conclude that it is a legitimate interest of the criminal trial process to protect a victim of crime from needlessly repeating testimony where the victim is presently diagnosed as being severely mentally ill and where the act of testifying again has a significant probability of worsening the condition. It was therefore reasonable for the state to seek to have L.L. declared unavailable for trial and the confrontation clause of the federal constitution was not violated by the court having done so.

Although we conclude the federal constitution does not bar the use of L.L.'s former testimony at trial, the next question is, does the state constitution require exclusion?

This court has had occasion to consider whether a physical or mental illness will cause a witness to be unavailable for trial so that the confrontation clause of the Wisconsin Constitution will not be violated by the use of former testimony. *Spencer v. State,* 132 Wis. 509, 112 N.W. 462 (1907) ; *Sheehan v. State,* 65 Wis. 2d 757, 223 N.W.2d 600 (1974).

In *Spencer,* the court determined that, under the Wisconsin Constitution, in order for former testimony to be admitted, it must be shown that the physical illness of the declarant was permanent. The case dealt with the admissibility of the preliminary hearing testimony of a witness who was suffering from rheumatoid arthritis and consumption with no hope of recovery and who was unable to appear at trial. The court there held the prior testimony admissible. The court in *dicta* stated that a mental disability must also be permanent for a declarant to be found unavailable for trial.

Relying upon the *dicta* in *Spencer,* the court in *Sheehan* determined that the deposition of the victim to a crime could not be admitted at trial because was no show-

ing that the victim was suffering from a permanent mental illness. *Sheehan*, 65 Wis. 2d at 765. In fact, all that was shown was that the victim would suffer from a mental illness on the day of trial and the following two days.

Although the holding in *Spencer* was based on an interpretation of the Wisconsin Constitution, except for the reference in *Sheehan* to *Spencer,* the opinion in *Sheehan* clearly relies upon the confrontation clause contained in the federal constitution. The court in *Sheehan* apparently recognized that the rights granted under the confrontation clauses of the state and federal constitutions were the same. We now make explicit what the court in *Sheehan* implicitly held; the confrontation rights under both constitutions are the same.[10]

Neither the state or federal constitutions prohibit the use of former testimony where it is demonstrated that the declarant is unavailable because she presently suffers from a severe mental illness of such duration as to make postponement of the trial impractical.

The defendant also relies on this court's decision in *State v. Gilbert,* 109 Wis. 2d 501, 326 N.W.2d 744 (1982) in arguing that probable emotional harm to a witness is not grounds for a witness to refuse to testify. The defendant relies on the following language in *Gilbert:*

"We can find no precedent, and none has been cited, that a court may completely excuse a witness from his or her obligation to testify because of the witness's claim of emotional harm . . . . This court has strictly construed the public policy in favor of having a witness testify when the witness claims emotional damage. The court refused to allow the use of a deposition in lieu of live

---

[10] Also see, *Bauer,* 109 Wis. 2d at 204 and *Dorcey,* 103 Wis. 2d at 160, in which the confrontation rights under both constitutions are treated as the same.

testimony in a criminal case when the argument was made that the witness was unavailable because testifying would cause him psychiatric illness." *Gilbert,* 109 Wis. 2d at 512.

But the defendant misreads the import of this court's holding in *Gilbert.* In *Gilbert,* this court reversed the trial court's quashing of a *subpoena ad testificandum* of the ten-year-old daughter of the defendant, her mother, charged with the murder of the witness' younger sister and the abuse of the witness. The trial court had held that it was "in the best interest of the child" not to be subjected to testifying at a preliminary hearing because of the possibility of psychological harm to the child from confronting her mother at such hearing. This court reversed saying:

"Excusing BP from testifying might spare her stress now but might harm her in the long run by failing to allow the state to bring to trial and possible conviction the alleged abuser. BP should tell her story not because this court disbelieves her claim of terror but because she has been terrorized." *Gilbert,* 109 Wis. 2d at 516.

This court pointed out that it is society's interest in having the testimony of those on whom the state must rely that make the rule expressed a social imperative. This court said in *Gilbert,* 109 Wis. 2d 505–506:

"The well-accepted legal principle, a fundamental tenet of our modern legal system, is that the public has a right to every person's evidence except for those persons protected by a constitutional, common-law, or statutory privilege. This principle applies to all of us—even to the President of the United States. . . .

"The principle and its corollary—that each person has a duty to testify—are basic to the adversary system. The integrity of the legal system depends on the court's ability to compel full disclosure of all relevant facts under the rules of evidence. The theory of the adversary system is that examination of all persons who have rele-

vant information will develop all relevant facts and will lead to justice. . . .

"In demanding the testimony the district attorney represents BP's interest and the public's interest in prosecuting an alleged child abuser and murderer."

These are among the reasons why the case before us is distinguishable from *Gilbert*. In addition to the above, this court specifically noted that it was deciding no issues relating to the confrontation clause in either the federal or state constitutions. 109 Wis. 2d at 507, Fn. 6.

In this case society and the defendant have had the testimony of L.L. who described in detail the assault by the defendant. The defendant subjected her to extensive cross examination.

Thus, the *reason* to compel the child's testimony in *Gilbert* is completely absent here. In this case the victim's direct testimony and her testimony under cross examination are available and were properly put into evidence in this case.

The victim in this case became a catatonic schizophrenic, after her preliminary examination testimony, as a result of the vicious assault upon her. We are not capable of understanding all the mechanisms the mind uses to cope with the seemingly unbearable. Calling on Jesus Christ to save her during her struggle, she continued to call on him during her hospitalization as she apparently relived the horror of her brush with death. Following slight improvement in her situation, she now seeks refuge in her religion from the haunting shadows of her experience. She is trying to "convert" her attacker, hence her pitiable letter and visit to him in the jail and also her feeling she shouldn't testify, treating this heinous crime as something between her and the defendant and outside the concern of the court. But, however one may admire or sympathize with her trying to cope by forgiving her attacker, the crime of which this de-

fendant was convicted was also a crime against society and it is society which is also wronged by his actions. Prosecution and punishment of offenders cannot be made contingent on the willingness of their victims to forgive the wrongdoer. One cannot forget that her forgiveness here is the product of a mind rendered seriously ill due to the defendant's assault upon her.

Of course, if the defendant could get this court to say the preliminary hearing testimony, given prior to her mental breakdown, was inadmissible and that she must be forced to take the stand, then the defendant sees the possibility that she will refuse to testify and then perhaps the charges would be dropped. The fact that her doctor testified there was a high probability of a relapse into her prior symptoms is a factor in this case that this court may not ignore.

Having concluded that the trial court did not abuse its discretion in admitting the preliminary hearing testimony of L.L. into evidence and having further concluded that neither the Wisconsin nor United States Constitutions bar such admission, we affirm the judgment of conviction.

*By the Court.*—Judgment of the trial court is affirmed.

HEFFERNAN, J. (*dissenting*). The majority opinion finds, *ab initio* apparently, that the victim's attitude of forgiveness is the product of a deranged mind and is, therefore, proof of severe mental disorder that in itself proves the witness unavailable. While this position of the majority—equating the spirit of forgiveness with insanity—could be challenged on various grounds, I criticize it because it evidences the majority's willingness to make findings of fact although the trial court has not done so. There is no evidence whatsoever that the witness' willingness to forgive her alleged attacker was the "product" of mental illness. What the majority tends to

prove is that the witness, as a matter of religious belief, does not approve of our system of law enforcement and does not deign to respond to a command of the court. But this, too, is a finding that an appellate court cannot make. This line of inquiry has nothing whatsoever to do with the unavailability of a witness.

A part of the evidence the majority assertedly relies upon—that the witness suffers from catatonia—is certainly at odds with the proof that she makes frequent visits to see her assailant. She is apparently not incapacitated for that purpose.

The record in respect to unavailability is confusing—and no wonder. The eventual determination by Judge Corbett was made on the basis of a stale, months-old record. No findings on the basis of up-to-date evidence were made in respect to the witness' physical or mental condition at or about the time of trial. The conclusions of the trial judge were based on evidence not then probative; and, contrary to intimations of the majority, there was no burden on the defendant to prove the witness was available.

Justice Abrahamson's dissent adequately explores the record and demonstrates that the findings and conclusions of the trial court comport with neither the evidence nor the law. The well intentioned efforts of the majority are equally ineffective for the same reasons; and to the extent that the majority makes findings on the basis of conflicting evidence or evidence from which a factfinder could reach different inferences, the majority exceeds its jurisdiction as an appellate court.

We cannot forget that the right of confrontation is a constitutional right afforded to an accused as a defense against the power of the state—a power which may be abused. While the very purpose of criminal prosecutions is to protect society from violations of its peace and dignity, an essential ingredient of societal well being is the

conviction of only the guilty. Our constitutional fore-fathers had reason to fear the state; hence, witnesses or other evidence must be produced by the state in court if a conviction is to be had. Only in rare cases can it be said, consistent with the constitution, that a witness is "unavailable" to appear and testify in person. In such case—and I conclude, under the evidence, this is not one—prior cross-examined testimony may be used.

The constitutional right to confrontation is not to be diluted by invocation of victim's rights. One who is convicted in violation of the confrontational right is a victim of the state. This court should not be a party to such victimization. To do so diminishes the rights of all victims—victims of criminal acts and victims of the occasional excesses of the state. Victims of crime and victims of government excess both must be protected by the courts. We do not afford succor or protection to victims of crime by abandoning or explaining away for insubstantial and unfounded reasons the cherished and venerable constitutional right to confront witnesses.

I dissent.

SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. The defendant raises only one issue for review: whether the circuit court abused its discretion in determining that the victim-witness was "unavailable" to testify at trial within the meaning of sec. 908.04(1)(d), Stats. 1981–82. Unless the witness is "unavailable," admission of her previous testimony violates the hearsay rule, sec. 908.045, 1981–82, and this defendant's constitutional rights to confront and cross-examine the witness. Because I believe that the record does not show that the witness was "unavailable" and because I believe that the majority opinion seriously undermines this court's and the legislature's efforts to protect victims and witnesses by invoking the concept of victim's rights in an incongruous context, I dissent.

## I.

The dispositive issue in this case is whether the circuit court abused its discretion in determining that this witness was unavailable for purposes of admitting hearsay evidence. The exercise of discretion "contemplates a process of reasoning which depends on facts that are in the record or are reasonably derived by inference from the record, and yields a conclusion based on logic and founded on proper legal standards." *Shuput v. Lauer,* 109 Wis. 2d 164, 177–78, 325 N.W.2d 321 (1982). I conclude that the circuit court abused its discretion both by failing to take factual evidence into account and by applying incorrect legal standards to the facts it considered.

The statutes define "unavailability" as the witness's inability "to be present or to testify at the hearing because of . . . [a] *then existing . . . mental illness or infirmity.*" Sec. 908.04(1)(d), Stats. 1981–82.[1] (Emphasis added.) The majority opinion recognizes that the circuit court determines unavailability in this case by applying the following test (*supra,* pp. 141, 142) : are the circumstances of the case such that "the act of testifying again" causes "a significant probability of worsening the condition" of the witness who "is presently diagnosed as being severely mentally ill" so that the circuit court could not reasonably require the proponent to produce the witness? The test is a difficult one; it is not easy for the circuit court to excuse the witness from testifying.

Other courts interpreting evidentiary rules similar to sec. 908.04(1)(d), Stats. 1981–82, have promulgated similar criteria to guide the trial court. The trial court must look at the witness's mental illness or infirmity existing at the time the witness is to testify, and the mental illness or infirmity must be so severe that the witness's at-

---

[1] This rule is identical to Federal Rule of Evidence 804(a)(4). 59 Wis. 2d R302–303.

tendance or testimony is rendered "relatively impossible and not merely inconvenient." *People v. Gomez,* 26 Cal. App. 3d 225, 230, 103 Cal. Rptr. 80, 84 (1972). The trial court must also recognize that because testifying may cause psychological or emotional harm to witnesses, the court must distinguish between available and unavailable witnesses on the basis of the degree of harm the witness will suffer as a result of testifying. The trial court must balance the harm to the witness against the fundamental principle that a witness is required to testify, *cf. State v. Gilbert,* 109 Wis. 2d 501, 512, 326 N.W.2d 744 (1982). A witness is unavailable if testifying would exacerbate the mental illness or infirmity to cause long-term harm that is far greater than the harm that testifying ordinarily causes to victims of and witnesses to similar crimes. *Warren v. United States,* 436 A.2d 821, 829–30 (D.C. App. 1981).

The following factors are relevant to determine unavailability:

(1) the psychological history of the witness;

(2) the nature of the mental illness or infirmity at the time of testifying;

(3) the probability of the act of testifying having an effect on the witness's mental illness or infirmity;

(4) the degree and duration of infirmity anticipated as a result of testifying;

(5) the expected duration of the mental illness or infirmity preventing testifying and whether the court could continue the trial to accommodate the witness's testimony.

These factors are helpful but not exhaustive. *See Warren v. United States,* 436 A.2d 821, 830 n. 18 (D.C. App. 1981) ; *People v. Williams,* 93 Cal. App. 3d 40, 155 Cal. Rptr. 414, 420–21 (1979) ; *People v. Gomez,* 26 Cal. App. 3d 225, 230, 103 Cal. Rptr. 80, 83–84 (1972) ; *People v. Lombardi,* 332 N.Y.S.2d 749, 750–51, 39 A.D.2d 700 (1972) ; *Peterson v. United States,* 344 F.2d 419, 425 (5th

Cir. 1965) ; 5 Wigmore, *Evidence,* sec. 1406, p. 219 (Chadbourn rev. 1974).

The state, like other proponents of certain hearsay evidence, has the burden of proving that the witness is "unavailable." *Ohio v. Roberts,* 448 U.S. 56, 65, 74–75 (1980). I conclude that the state did not carry its burden of proof and that the circuit court abused its discretion by failing to take into account the factual evidence that showed that the witness was not unavailable.

Under sec. 908.04(1)(d), Stats. 1981–82, the circuit court must first determine the witness's psychological history and the nature of the mental illness or infirmity. The circuit court, learning about the witness from the testimony of Dr. Busby, found that the witness suffered from acute schizophreniform disorder.

Dr. Busby testified that to a reasonable degree of scientific or medical certainty the witness suffered from "acute schizophreniform disorder," as defined in *Diagnostic and Statistical Manual of Mental Disorders* (3d ed. 1980) (DSM III).[2] Dr. Busby noted that according

---

[2] "295.40 Schizophreniform Disorder. *The essential features are identical with those of Schizophrenia with the exception that the duration, including prodromal, active and residual phases, is less than six months but more than two weeks.* Schizophreniform Disorder is classified outside the category of Schizophrenic Disorders because evidence suggests a greater likelihood of emotional turmoil and confusion, a tendency toward acute onset and resolution, more likely recovery to premorbid levels of functioning, and the absence of an increase in the prevalence of Schizophrenia among family members compared with the general population. *The six-month criterion has been chosen because several studies indicate that this is the best single way of differentiating these two disorders to maximize the difference in their external correlates.* . . .

"Differential Diagnosis. Since the diagnostic criteria for Schizophrenia and Schizophreniform Disorder differ only in duration of illness, most of the discussion of differential diagnosis in the text for Schizophrenia . . . applies equally to Schizophreni-

to a previous system of diagnostic nomenclature the witness's mental illness could be classed as "schizophrenia."[3] When asked whether the witness would recover, he answered he "really couldn't say" but that it was "possible that she would continue to improve over the X number of years, maybe two or three, maybe five or ten, and perhaps eventually recover spontaneously in that manner." The doctor also testified that with help it was possible that she might recover more quickly.

Dr. Busby's testimony is confusing and internally inconsistent. As the majority here recognizes, the distinction between the diagnoses of schizophrenia and acute schizophreniform disorder is not semantic, but substan-

form Disorder, with the exception that the clinical picture in Schizophreniform Disorder is more often characterized by emotional turmoil, fear, confusion, and particularly vivid hallucinations.

". . .

"Diagnostic criteria for Schizophreniform Disorder.

"A. Meets all of the criteria for Schizophrenia . . . except for duration.

"B. *The illness (including prodromal, active, and residual phases) lasts more than two weeks but less than six months.*"

*Diagnostic and Statistical Manual of Mental Disorders* (3rd ed. 1980), pp. 199–200 (emphasis added).

"Acute" is a descriptive term attached to the diagnosis. Referring to a disease, "acute" means "having a sudden onset and a short, but rather severe, course; opposed to chronic, which designates a relatively slow onset and a protracted, but mild, course. . . ." Schmidt, 1 *Attorneys' Dictionary of Medicine* p. A–65 (1982).

[3] "Schizophrenia' is "no longer regarded as a single mental disorder but as a group of mental disorders." The principal types of schizophrenia are simple, paranoid, catatonic and hebephrenic. Schizophrenia is marked by "withdrawal from and indifference to one's surroundings, delusions of personal power or of persecution, hallucinations, unpredictable behavior, and deterioration of personality. . . ." Schmidt, 1 *Attorneys' Dictionary of Medicine*, p. S–29 (1982).

For diagnostic criteria for schizophrenia, *see Diagnostic and Statistical Manual of Mental Disorders* (3d ed. 1980) pp. 188–90.

tive. *Supra*, p. 136, n. 6. Schizophrenia and acute schizophreniform disorder are different diseases.[4] Although they have identical manifestations, schizophrenia may last for several years, while acute schizophreniform disorder lasts from two weeks to six months. The trial in this case took place six months after the original diagnosis when the witness might be expected to have recovered if the diagnosis of acute schizophreniform disorder was correct.

Faced with this potentially confusing testimony as to whether the witness suffered from schizophrenia or acute schizophreniform disorder, the circuit court (Judge Zievers presiding) stated that it "is satisfied that the witness [L.L.] had been diagnoses [sic] and was suffering from *acute schizophreniform disorder* which the court finds continues to exist . . . so as to warrant a declaration of unavailability." (Emphasis added.) This court must assume that the circuit court understood the doctor's testimony, the medical terms, and the characteristics of acute schizophreniform disorder before it made a finding of fact that the witness suffered from this particular disorder.

Because a finding that the witness's mental illness was short-term is inconsistent with the circuit court's ruling that the witness was unavailable, the majority is compelled to ignore the circuit court's finding of acute schizophreniform disorder (*supra*, p. 136, n. 6) in order to reach the result it does, that is, upholding the circuit court's ruling that the witness was unavailable. Rather than accept the circuit court's finding of fact as to the nature of the mental illness or infirmity, the majority substitutes its own findings for that of the circuit court. The majority finds that the witness suffered from "schizophrenia"

---

[4] See description of schizophrenia and acute schizophreniform disorder in notes 2 and 3, *supra*.

(*supra*, p. 140) and "became a catatonic schizophrenic"[5] (*supra*, p. 146).

I cannot join the majority's incursion into the circuit court's realm of expertise as the trier of fact and the majority's willingness to ignore this court's dictates that the "weight of the evidence and the credibility of the witnesses are matters resting within the province of the trier of fact." The majority had best heed its own admonition to the court of appeals that an appellate court is precluded from "making any factual determinations where the evidence is in dispute." *Wurtz v. Fleischman*, 97 Wis. 2d 100, 107, and n. 3 at 107, 293 N.W.2d 155 (1980).

Moreover, the majority's finding that the witness suffered from schizophrenia and is a catatonic schizophrenic is against the great weight and clear preponderance of the evidence. The witness's conduct is, as I shall explain later, consistent with Dr. Busby's diagnosis of and the circuit court's finding of acute schizophreniform disorder, not schizophrenia.

After determining the psychological history and nature of the mental illness or infirmity, the circuit court should then consider whether the mental illness was in existence at the time her testimony was to be given. The circuit court concluded the illness was extant. After reading the record, I conclude that the state did not carry its burden of proving that the illness existed either six weeks before trial at the time of Judge Zievers's ruling on unavailability or at the time of trial.

---

[5] "Catatonic schizophrenia" is "a form of schizophrenia characterized by disturbances in mobility or movement, ranging from complete inhibition (e.g., stupor) to frenzied activity. There may be severe regression, so that the bodily requirements of the patient (such as feeding or elimination) must be attended to by others." Schmidt, 1 *Attorneys' Dictionary of Medicine*, p. S–29 (1982).

Dr. Busby's testimony at the December hearing concerning the witness's illness was based on a diagnosis he had made in September-October while the witness was under his care. By the time she left his care in October, she had already improved 10 to 20 percent. He had not seen or spoken to her (except once or twice by phone) during the nearly two-month interval between her discharge from the hospital and his testimony. Dr. Busby's observations about the continuing nature of the witness's illness were based on his conversations with the witness's parents, primarily her father, who knew that if his daughter was suffering from a mental illness she might be excused from testifying. Dr. Busby testified that the father, a protective and loving parent, was doing everything he could to prevent his daughter from testifying. Faced with the doctor's lack of recent personal information, the biased source of the doctor's more recent information, and the diagnosis of acute schizophreniform disorder, a disease which could terminate within two weeks of its onset, the circuit court was aware that Dr. Busby's testimony was stale.

The circuit court did not rule on the question of unavailability until January 16, 1981, by which time three months had elapsed since Dr. Busby had seen the witness. More important, the defendant produced evidence at the January 16 hearing that appears to contradict the majority's characterization of the witness as a "catatonic schizophrenic" and the circuit court's finding that the mental illness or infirmity Dr. Busby described existed as of January 16. The defendant testified that the witness had voluntarily initiated contact with him, that she had sent him a Bible, had asked him to put her on his visiting list, and had visited him in prison. Her letters to the defendant, which are part of the record, stated that she had forgiven him.

The circuit court (Judge Zievers) stated that this new evidence "neither adds nor detracts" from Dr. Busby's

testimony and ruled the witness unavailable. I believe that the circuit court abused its discretion in ignoring these facts. An exercise of discretion, as this court has stated, "contemplates a process of reasoning which depends on facts that are in the record." *Shuput v. Lauer,* 109 Wis. 2d 164, 177–78, 325 N.W.2d 321 (1982). The facts support Dr. Busby's diagnosis and the circuit court's finding of acute schizophreniform disorder because they show that the witness was functioning much more normally than when she was diagnosed. The facts refute Dr. Busby's prediction that the victim might not recover for two or more years.

Even if the circuit court did not abuse its discretion in January in ruling that the witness was unavailable, the circuit court (Judge Corbett presiding) abused its discretion when it again declared the witness unavailable at trial in March.

The majority asserts that the only reason the circuit court reconsidered the witness's unavailability in March was because of a change of judges (*supra,* pp. 140, 141) and that this reconsideration was unnecessary. The majority implies that any error Judge Corbett might have made in redetermining unavailability is irrelevant. I disagree.

The time interval between the medical examination of the witness and the determination of unavailability is highly relevant to the trial court's determination of whether the witness is unavailable at the time the testimony is to be given. *Warren v. United States,* 436 A.2d 821, 830 (D.C. App. 1981) ; *Sheehan v. State,* 65 Wis. 2d 757, 765–66, 223 N.W.2d 600 (1974) ; *United States v. Benfield,* 593 F.2d 815, n. 4 at 817 (8th Cir. 1979). If the mental illness or infirmity is of a temporary nature, as is acute schizophreniform disorder, the trial court should grant a continuance to allow the witness to testify before the jury where the charges are serious, the testi-

mony is essential, and the trial could be postponed to allow the testimony. *Peterson v. United States,* 344 F.2d 419, 425 (5th Cir. 1965) ; 5 Wigmore, *Evidence,* sec. 1406, p. 219 (Chadbourn rev. ed. 1974).

I view it as constitutionally incumbent upon the trial court in a criminal case to require the state to keep it informed as to the mental illness or infirmity of a witness who has been ruled unavailable up until the time that the witness is to testify; to hold otherwise would be to allow a possibly temporary illness, albeit severe, to deprive defendants of their right to confront and cross-examine witnesses.

Even accepting the majority's premise that Judge Corbett had no duty to reopen the issue of the witness's unavailability, Judge Corbett thought he had such a duty and allowed the defendant to reopen the issue. Judge Corbett held a hearing on the matter and concluded that the witness continued to be unavailable. This ruling is based on an erroneous summary of Dr. Busby's testimony and a failure to consider the only evidence presented at this hearing.

This second hearing on availability occurred at the trial that began on March 3, 1981, four and one-half months after Dr. Busby's last contact with the witness, more than two months after Dr. Busby's testimony, and six weeks after the circuit court's first ruling that the witness was unavailable. Judge Corbett made his ruling at this second hearing without Dr. Busby's testimony or Judge Zievers's findings before him. The transcript was not then available. The judge's sole knowledge of the contents of Dr. Busby's testimony came from the assistant district attorney's recollection of it. She neither had a transcript of the testimony nor testified under oath. She informed the court that the witness suffered from "a schizoid disorder" and that Dr. Busby's prognosis was that "without psychiatric counseling that it would take approximately three

to four years before she could recover if she would." This recollection was inaccurate. A "schizoid disorder" is neither schizophrenia nor acute schizophreniform disorder,[6] and Dr. Busby did not testify that the witness's recovery would take three to four years. Nonetheless, Judge Corbett gave the assistant district attorney's summary of Dr. Busby's diagnosis and prognosis great weight.

Furthermore, Judge Corbett ignored the evidence that the defendant adduced. The defendant introduced evidence that the witness had continued to visit the defendant twice a week, that she was working and contemplating going to nursing school, and that she seemed "well." The majority dismisses this evidence without any explanation other than hinting that only testimony from a professional could be sufficient to show that the witness was no longer unavailable. (*Supra*, pp. 138–139). This factual evidence, though, is consistent with the diagnosis of a mental illness that could have run its course by that time.

The record reveals that even the state had serious doubts that the witness was "unavailable" at the time of trial. The state subpoenaed the witness two weeks before trial, even though Judge Zievers had previously ruled that the witness was unavailable. The assistant district attorney testified under oath that when the district attorney's office learned of the witness's visits to the defendant, it decided it "would be better to produce the victim for the jury if at all possible if she were able or willing to testify" and to present Dr. Busby to explain the witness's unwillingness to answer any questions. Shortly after being subpoenaed, the witness telephoned the assistant district attorney and read passages from the New Testament[7] relating to forgiving one's brothers, and

---

[6] "Schizoid" is defined as a designation of an "unsocial, introspective type of personality or person," or "pertaining to, or resembling schizophrenia; like schizophrenia." Schmidt, 1 *Attorneys' Dictionary of Medicine*, p. S–28 (1982).

[7] Matthew 18:15, 5:38, 5:33; Corinthians 6:1.

told the assistant district attorney that "if you have a dispute with your brothers you're not to go to the courts but rather you're to confront your brother with the wrong and if your brother admits it and you can settle it between yourselves then you are to forgive your brother and you will be forgiven in heaven, or something like that." The witness quoted other passages stating that there should be "no lawsuits before pagans, and the witness stated she did not believe in the court system, and she was not going to testify" because she had forgiven the defendant; she would appear at his sentencing.

On the basis of this information, the assistant district attorney decided to rely upon Judge Zeivers's ruling that the witness was unavailable for psychiatric reasons, rather than attempt to elicit her testimony and explain it (or lack of it) at trial.

I conclude that the circuit court and the majority have erred in accepting the assistant district attorney's value judgment that the witness's explanation of her desire to live in accordance with religious teachings is a manifestation of a continuing severe mental illness or infirmity. It is not clear from the record that the witness manifested symptoms of an illness rather than exhibited her religious beliefs. Dr. Busby testified that the witness came from a religious family. A growing number of lawyers share the witness's religious beliefs and do not believe in the adversary system.[8]

---

[8] The Christian Legal Society, formed in 1961, has a membership of about 4,000 lawyers, law students, and judges who believe that because the Bible bars Christians from suing one another (Corinthians 1:6), the "lawyer's role in legal disputes should be one of peacemaker and reconciler rather than that of adversary." These lawyers try to take into account what they view as God's law as well as man's and support the Center for Law and Religious Freedom and a national network of ten Christian Conciliation Service centers to foster their philosophy. Most of the lawyers apparently agree that the Scriptures bind them to preach "forgive-

The district attorney's office clearly recognized that the witness was capable of being present and testifying and that it could explain the witness's refusal to testify to the trier of fact. If the witness were incompetent to testify, the circuit court, not the prosecutor, should make this determination. Mental illness or infirmity does not necessarily render a witness *incompetent,* that is, untrustworthy as a witness to observe, remember, and recount. McCormick, *Evidence,* sec. 62, pp. 140–41; sec. 253, p. 611 (2d ed. 1972) ; 2 Wigmore, *Evidence,* sec. 492 (Chadbourn rev. 1979). *See also* sec. 906.01, Stats. 1981–82; 59 Wis. 2d R157–R160; Weinstein and Berger, *Weinstein's Evidence,* par. 601[03], pp. 601–25–601–28; 601[04], pp. 601–29–601–33 (1982). If the witness's credibility was questionable, the jury, not the prosecutor or the circuit court, should resolve this issue. Sec. 906.07, Stats. 1981–82. The majority confuses the interrelated concepts of unavailability because of mental illness or infirmity, competency, and credibility.

I conclude that the evidence is insufficient for a circuit court to conclude that the mental illness was "then existing." Even if the mental illness were then existing, there was no evidence that testifying would worsen it, and if so, to what extent. Dr. Busby stated that there was a "high probability" that if the witness testified she might suffer "anywhere from a moderate to a substantial relapse and return of her symptoms." He never explained what symptoms might reappear and how long the relapse would last. Dr. Busby appears to have based this prediction on his concern that the testimony would cause the witness to relive the assault and that this recollection,

ness, reconciliation, mediation and confession in order to steer their clients—especially Christian ones—away from secular courts. 'It is better to be defrauded than to take another believer to court,' " stated the group's director. Martin, *Jesus: The Ultimate Plea Bargainer? Christian Lawyers Congregate,* 4 *National Law Journal,* March 1, 1982, pp. 3, 45.

not the act of testifying in itself, would cause a relapse. The witness's initiating contact with the defendant without suffering a relapse rebuts Dr. Busby's theory that the witness's confrontation with the event would cause a relapse. I conclude that the state did not, as a matter of law, introduce sufficient evidence to prove that this witness was "unavailable."

The circuit court was able to ignore the import of the facts proved by applying erroneous legal standards to them. Judge Corbett apparently shifted the burden of proof from the state to prove "unavailability" to the defendant to prove "availability." Judge Corbett also erred in requiring the defendant, not the state, to produce the witness. The burden is on the proponent of hearsay evidence to make good-faith efforts to procure the witness's attendance. *Barber v. Page,* 390 U.S. 719 (1968); *Ohio v. Roberts,* 448 U.S. 56, 74 (1980); *United States v. Lynch,* 499 F.2d 1011, 1024 (D.C. Cir. 1974). The assistant district attorney testified that she had subpoenaed the witness two weeks before trial but the state did not attempt to enforce the subpoena because it did not think that the witness wanted to testify. The circuit court chastised the defendant for not compelling the witness's presence at trial instead of requiring the state to enforce the subpoena for its chief witness.

The circuit court further erred as a matter of law by implicitly finding the witness unavailable because she was reluctant to testify, not because she suffered from a then existing mental illness. The circuit judge stated that he would be "out of his cotton-picking mind" if he "blamed the district attorney or the assistant district attorney for not bringing her in when she said she's going to refuse to testify and didn't take an oath and didn't believe in the whole system and the fact that she has now forgiven this man and that the Bible tells her so. Especially in view of the fact that Judge Zievers had heretofore on January

16th declared her unavailable, I think [the assistant district attorney] had every right to rely on that."[9]

A witness cannot be declared "unavailable" simply because the prosecutor or circuit court concludes that the witness might not want to testify. The witness must "persist in refusing to testify concerning the subject matter of [her] statement *despite an order of the judge to do so.*" Sec. 908.04(1)(b), Stats. 1981–82. (Emphasis added.) When another individual's liberty is at stake, the decision to allow a witness to be exempt from the public duty to testify must be made by the trial court, not the witness or the state.

For the reasons set forth, I conclude that the circuit court abused its discretion in this case in declaring the witness unavailable.

## II.

Although the majority affirms the circuit court's ruling that the witness was unavailable under sec. 908.04(1)(d), Stats. 1981–82, and acknowledges that the defendant concedes that his constitutional rights were not violated if the witness is "unavailable," *supra,* p. 141, the majority opinion continues. The majority in dicta discusses the constitutional issues and attempts to bolster its affirmance of the circuit court's ruling by reference to victims' rights, thereby making a mockery of the legislature's, this court's, and society's concern for victims.

---

[9] Judge Corbett went on to say that if the district attorney had evidence that the witness was "available within the meaning of the statute," he would fault the state for not bringing her in. The record shows that the district attorney did have such evidence, though, as did the court, and the district attorney even subpoenaed the witness. Judge Corbett, however, chose to ignore these facts, deferring instead to the psychiatrist's stale prognosis that the witness would not be available by the time of trial.

Chapter 949, Stats. 1981–82, upon which the majority relies, has nothing to do with court testimony; it provides compensation for victims of crimes. Chapter 950, upon which the majority also relies, concerns the rights of victims and witnesses in the criminal justice system. As the majority notes, this chapter was enacted to recognize the "civil and moral duty of victims and witnesses of crime to fully and voluntarily cooperate with law enforcement and prosecutorial agencies." Sec. 950.01. Nothing in Chapter 950 indicates that the legislature believes that treating the witness with "dignity, respect, courtesy and sensitivity" includes excusing the witness from testifying.

I, like the majority, am concerned about protecting the victims of crimes from harassment and stress in the criminal justice system. As this court pointed out in *State v. Gilbert,* 109 Wis. 2d 501, 515, 326 N.W.2d 744 (1982), the judiciary "has not been oblivious to concerns about the emotional health of witnesses," and the judiciary must "attempt to accommodate the needs" of victim-witnesses and the court system "within the context of the public policy of achieving justice through the adversary system." *Id.* at 516. In *Gilbert* we urged courts and lawyers to use the tools available in the criminal justice system to eliminate or lessen the burden on witnesses "while making [their] testimony available in the criminal proceeding." *Id.* at 517.

In this case, there was no evidence that at the time of trial this witness feared the defendant or wished to be protected from him. The record shows that the witness did not want to testify because she had forgiven the defendant. As far as I can tell, the detriment that testifying will cause to the witness in this case is that she might view her testimony as conflicting with her religious beliefs and that she might not be willing to repeat her damaging preliminary examination testimony.

This court recognized, as early as 1907, that a defendant's right to confront and cross-examine witnesses is

"one of the most sacred and valuable safeguards of the citizen," "is an essential and fundamental requirement for a fair trial," and is fundamental to our system of criminal justice. *Spencer v. State,* 132 Wis. 509, 511, 112 N.W. 462 (1907). *See also State v. Bauer,* 109 Wis. 2d 204, 208, 325 N.W.2d 857 (1982); *Sheehan v. State,* 65 Wis. 2d 757, 764, 223 N.W.2d 600 (1974); *Mattox v. United States,* 156 U.S. 237, 242–43 (1895). The witness in this case is not unavailable, and this is not one of the rare cases where the fundamental constitutional right of confrontation must give way. *State v. Bauer,* 109 Wis. 2d 204, 213, 325 N.W.2d 857 (1982); *Hagenkord v. State,* 100 Wis. 2d 452, 473, 302 N.W.2d 421 (1981); *State v. Olson,* 75 Wis. 2d 575, 592–93, 250 N.W.2d 12 (1976).

This court, the circuit courts, and the state must remember that even though we must have compassion for a victim-witness, a basic tenet of our legal system is that the public has a right to every person's evidence. We must be willing to change the legal system to accommodate the needs of the witness, but we must preserve the basic concepts of justice and fairness. In a criminal case the accused's liberty and the rights secured by the United States and Wisconsin Constitutions must be protected. The majority's invocation of the high ideals of victims' rights to secure an unconstitutional conviction in this case does a grave injustice to witnesses and victims.

Because I believe that the majority has ignored critical facts in this case that reveal that this particular witness was not "unavailable" at the time of trial, I dissent.