**Charles R. BURNS, Petitioner,**

v.

**Donald CLUSEN, Respondent.**

Civ. A. No. 83–C–1489.

United States District Court,
E.D. Wisconsin.

Dec. 27, 1984.

Steven D. Phillips, Asst. State Public Defender, Madison, Wis., for petitioner.

Daniel J. O'Brien, Asst. Atty. Gen., Madison, Wis., for respondent.

### DECISION and ORDER

TERENCE T. EVANS, District Judge.

Charles R. Burns, an inmate at the Green Bay Correctional Institution, Green Bay, Wisconsin, has petitioned for a writ of habeas corpus.

Burns was convicted of first-degree sexual assault, endangering safety by conduct regardless of life, two counts of kidnapping, armed robbery, and verbally threatening to injure another [1]. The charges arose from two separate incidents, both of which occurred on the same day, May 6, 1980. Two women were Burns' alleged victims, M.S. and L.L. (the victims' full names were used throughout the record; however, the Wisconsin Supreme Court used their initials, so I will do the same).

Burns was charged with kidnapping for the abduction of M.S. in Somers, Kenosha County, Wisconsin, on the morning of May 6. M.S. was forced at gunpoint to drive to a parking lot where, to escape, she intentionally rammed her car into a set of garbage cans, fled, and screamed for help. She later identified Burns as her abductor [2].

The other charges relate to an incident which happened on the evening of May 6.

---

1. The crimes listed here come from the Judgment of Conviction. The Wisconsin Supreme Court, in its opinion, lists them as first-degree sexual assault, endangering safety by conduct regardless of life, one count of kidnapping, robbery and verbally threatening to injure another.

2. Burns' only challenge to his conviction for the abduction of M.S. was that the two cases were tried together and that L.L.'s testimony laid the groundwork for both convictions. Since I cannot sustain Burns' claims as to L.L.'s case, his claims as to the case involving M.S. necessarily fall short.

L.L. testified at a May 22, 1980, preliminary hearing that she was accosted by a person, whom she identified as Burns, in a restaurant parking lot in the City of Kenosha. Burns walked up to her, pulled out a gun, and forced her to drive to a secluded area a distance away from the restaurant. Once parked, Burns forced L.L. into the back seat of the car where he attacked her. He struck her with a gun, forcibly removed her clothes, threatened her life, sexually assaulted her, removed money from her purse, attempted to strangle her with a wire. He then fled on foot. L.L. identified Burns with the aid of an artist's sketch and from photographs supplied to her by the Kenosha County Sheriff. She identified Burns in person at the preliminary hearing, and described in detail the ample opportunity she had to view him. She was extensively cross-examined by Burns' counsel.

As the trial date approached, the prosecutor attempted to produce L.L. for the purpose of complying with discovery demands. She refused, stating that she had "forgiven" the defendant. The prosecutor then made arrangements to have her arrested as a material witness, but these efforts were halted when he learned that L.L. had developed severe psychological problems and had been hospitalized because of them. The prosecutor then made a motion to declare L.L. unavailable to testify at trial. At a hearing on the motion, held on December 9, 1980, testimony was received from Dr. David F. Busby, who treated L.L. during her hospital stay. Busby's testimony was based on personal observations which took place during a one-month period ending on October 18, 1980, and on subsequent conversations with her parents up until the time of the hearing. Based on his observations at the hospital and on the lack of progress which had been reported to him by L.L.'s parents since her discharge, Busby stated that forcing L.L. to testify at trial would have a "high probability [of causing] anywhere from a moderate to substantial relapse and return of [L.L.'s] symptoms...." The trial judge took the matter under advisement.

Not too long after this hearing took place L.L. wrote to Burns, asking him to "accept the Lord Jesus into your life," and urging him to read the Bible. She also asked to visit Burns in jail, and apparently did so at the rate of twice a week.

At the conclusion of a continuation hearing held on January 16, 1981, the court ruled that L.L. was unavailable to testify at trial within the meaning of a Wisconsin Rule of Evidence, § 908.04(1)(d). Judge William Zievers stated:

"... Based upon the testimony of Dr. Busby, ... the court is satisfied that the witness [L.L.] had been diagnosed and was suffering from acute schizophreniform disorder up to and including the date of her discharge from the hospital, ... and that among the half-dozen or so rape victims seen by this particular forensic psychiatrist this was the most severe case of reaction that he had seen, and that her condition is one of an existing mental illness or infirmity which the court finds continues to exist ..."

Judge Zievers was later replaced by Judge Thomas Corbett. Judge Zievers' ruling was not disturbed, even though Burns' trial did not begin until a month and a half after it was reached, four and a half months after Dr. Busby had last seen L.L. On the day the trial began, March 2, 1980, Burns' counsel urged Judge Corbett to review Judge Zievers' decision. Judge Corbett refused.

The jury trial commenced. In place of L.L.'s live testimony, the court permitted the state to introduce a transcript of her testimony at the preliminary hearing. Burns was convicted on all five counts.

Burns' appeal to the Court of Appeals was certified directly to the Supreme Court, which denied him relief. A divided court (5–2) ruled that the evidence supported the finding that L.L. was suffering from a "then existing ... mental illness" which made her unavailable to testify at trial. The Court found that Judge Corbett did not abuse his discretion when he relied on Judge Zievers' initial ruling instead of making new findings at the outset of the trial. The Court explained that had Judge Zievers himself relied on his earlier deter-

mination, no abuse of discretion could be found. Merely because Judge Zievers was replaced would not, therefore, require that the procedure be repeated. The Court also concluded that the confrontation clauses of the United States and Wisconsin Constitutions were not violated by the use of L.L.'s former testimony. *State v. Burns,* 112 Wis.2d 131, 140–141, 332 N.W.2d 757 (1983).

The Court further explained that "it is a legitimate interest of the criminal trial process to protect a victim of crime from needlessly repeating testimony where the victim is presently diagnosed as being severely mentally ill and where the act of testifying again has a significant probability of worsening the condition." *Id.* at 143, 332 N.W.2d 757. The court went on to emphasize that Burns' confrontation rights were protected by the fact that L.L. was extensively cross-examined at the pretrial hearing. *Id.* at 146, 332 N.W.2d 757. In reviewing the evidence underlying the trial court's finding of unavailability, the Supreme Court added, apparently on its own, the following finding:

> "following slight improvement in her situation, she now seeks refuge in her religion from the haunting shadows of her experience. She is trying to 'convert' her attacker, hence her pitiable letter and visit to him in the jail and also her feeling she shouldn't testify, treating this heinous crime as something between her and the defendant and outside the concern of the court.... One cannot forget that her forgiveness here is the product of a mind rendered seriously ill due to the defendant's assault upon her."

*Id.* at 146–147, 332 N.W.2d 757.

Burns now seeks relief in this court by way of habeas corpus. He contends that his constitutional right to confront his accusers was violated by the admission into evidence of L.L.'s preliminary hearing testimony.

This case presents an issue that is somewhat confusing: the relationship between the confrontation clause and the hearsay rule with its many exceptions. The rule against hearsay, of course, is riddled with exceptions. These exceptions vary among jurisdictions as to number, nature, and detail. *See, e.g.,* Fed.Rules Evid. 803, 804.

The Sixth Amendment's Confrontation Clause, made applicable to the states through the Fourteenth Amendment, *Pointer v. Texas,* 380 U.S. 400, 403–405, 85 S.Ct. 1065, 1067–1068, 13 L.Ed.2d 923 (1965), provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." If one were to read this language literally, it would require the exclusion of any statement made by a declarant not present at trial. See *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895) ("[T]here could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations"). If literally applied, the Clause would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme. *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

■ The historical evidence leaves little doubt, however, that the Clause was intended to exclude most hearsay. See *California v. Green,* 399 U.S. 149 at 156–157, 90 S.Ct. 1930 at 1934, 26 L.Ed.2d 489 (1970). Moreover, underlying policies support the same conclusion. The United States Supreme Court has emphasized that the Confrontation Clause reflects a preference for fact-to-face confrontation at trial, and that "a primary interest secured by [the provision] is the right of cross-examination." *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). In short, the Clause envisions

> "a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States,* 156 U.S. at 242–243, 15 S.Ct. at 339–340.

The Court, however, has recognized that competing interests, if "closely examined," *Chambers v. Mississippi,* 410 U.S. 284 at 295, 93 S.Ct. 1038 at 1046, 35 L.Ed.2d 297 (1973), may warrant dispensing with confrontation at trial. See *Mattox v. United States, supra,* 156 U.S. at 243, 15 S.Ct. at 340 ("general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case"). Significantly, every jurisdiction has a strong interest in effective law enforcement, and in the development and precise formulation of the rules of evidence applicable in criminal proceedings. See *Snyder v. Massachusetts,* 291 U.S. 97, 107, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934); *Ohio v. Roberts, supra* 448 U.S. at 64, 100 S.Ct. at 2538.

Recognizing these competing interests, the Supreme Court, in a series of cases, has sought to accommodate them. A general approach to the problem is discernible. As explained in *Ohio v. Roberts:*

"The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. [citations omitted.]

"The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.' "

448 U.S. at 65, 100 S.Ct. at 2538–2539.

The "second aspect" discussed in *Ohio v. Roberts* concerns itself with evidence that has a sufficient "indicia of reliability." As stated in *Mancusi v. Stubbs*

"The focus of the Court's concern has been to insure that there 'are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant,' [citation omitted] and to 'afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement,' [citation omitted]. It is clear from these statements, and from numerous prior decisions of this Court, that even though the witness be unavailable his prior testimony must bear some of these 'indicia of reliability.' "

408 U.S. 204 at 213, 92 S.Ct. 2308 at 2313, 33 L.Ed.2d 293 (1972).

The Supreme Court has applied the "indicia of reliability" requirement principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the "substance of the constitutional protection." *Mattox,* 156 U.S. at 244, 15 S.Ct. at 340. This reflects the truism that "hearsay rules and the Confrontation Clause are generally designed to protect similar values," *California v. Green,* 399 U.S. at 155, 90 S.Ct. at 1933, and "stem from the same roots," *Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970). It also responds to the need for certainty in the workaday world of conducting criminal trials. *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539.

■ In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

Here, the testimony given by L.L. while under oath at the preliminary hearing, held just 16 days after she was attacked, is the type of evidence that bears the appropriate "indicia of reliability." The pivotal question is whether she was "unavailable" to take the stand and give testimony during Burns' trial.

Under Wisconsin law, a declarant is unavailable if she "is unable to be present or to testify at the hearing because of death or then-existing physical or mental illness or infirmity." § 908.04(1)(d), Wis. Stats. The Wisconsin law on this point is the same as Federal law. See Rule 804(a)(4), (b)(1).

The question here is whether the record fairly supports the Wisconsin court's finding that the state demonstrated that L.L. was suffering from a *then-existing* mental illness". Before I can get to that question, however, I must decide if the finding is one of fact.

When federal courts are asked in habeas cases to review a state court's factual determinations which were based on the same record presented to it, the federal court must afford "considerable deference" to those determinations. Before I may reject them, the petitioner must prove by convincing evidence as required under 28 U.S.C. § 2254(d) that the state court's factual findings were erroneous. *Sumner v. Mata,* 449 U.S. 539, 547, 550, 101 S.Ct. 764, 769, 770, 66 L.Ed.2d 722 (1981); *see United States ex rel. Heral v. Franzen,* 667 F.2d 633, 636 (7th Cir.1981). The state court findings of historical fact are entitled to a "high degree of deference" in this court and will only be rejected if I conclude that those findings lack even "fair support" in the record. *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 849–51, 74 L.Ed.2d 646 (1983); *see Holleman v. Duckworth,* 700 F.2d 391, 395 (7th Cir.1983); *Collins v. Israel,* 538 F.Supp. 1211, 1213 (E.D.Wis. 1982).

While the findings of historical fact are presumed correct and normally merit federal court deference, the legal conclusions drawn by state courts from those historical facts on the federal constitutional question raised are subject to independent review in this court. *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). In the same fashion, "mixed" questions of law and fact are subject to independent federal review. *See Nash v. Israel,* 707 F.2d 298, 301 (7th Cir. 1983).

Clearly, therefore, the numerous state court findings of fact in this case are presumptively correct. However, the finding of "unavailability" in this case does have some resemblance to a "mixed" determination rather than a straight finding of fact. It clearly leans more, however, in the factual direction. This is so because at both the state and federal court level, the determination of "unavailability" is usually treated as a factual question left to the discretion of the trial judge; that determination to be reversed only if an abuse of discretion is shown. As the Second Circuit Court of Appeals stated on direct review of a district court's "unavailability" determination in a federal criminal prosecution:

"Although appellant argues to us that in a case of temporary illness, 'the convenience to the Government must give way to the rights of the accused,' we think that in the first instance it is up to the district judge to decide if the witness is truly 'unavailable'—a finding that we would not be quick to overturn. Once this determination is made, the law is clear that prior testimony may be admitted when given—as here—in court, under oath, subject to cross-examination and on the very issue (identification) for which it was offered at trial."

*United States v. Bell,* 500 F.2d 1287 at 1290 (2nd Cir.1974) (footnotes omitted). *Also see* 5 Wigmore, *Evidence* § 1406 (Chadbourn Rev.1974).

Although I admit it is a close question, I will proceed to consider the finding as "mixed." I do so because the "unavailability" issue appears to take on a constitutional dimension of its own when analyzed in the context of the confrontation clause, as opposed to simply in the context of Wisconsin's hearsay rules.

Accordingly, I will independently review the ultimate finding, viewing as presumptively correct the state court factual determinations that underpin it.

■ The finding that L.L. was suffering from a "then-existing mental illness" was made on January 16, 1981. The trial of this case began on March 2, 1981. The finding was based entirely on the testimony of Dr. Busby, who last examined L.L. in October 1980. In pertinent part, this is what Dr. Busby had to say:

Physically she was obviously very undernourished. Mentally she was what we call a catatonic stupor with hallucinations and delusions. What a layman refers to as almost like a basket case. Practically non-functional. Would stand in one spot and talk to the wall, refuse to eat, refuse to dress or undress, refused all medication, refused all communication on admission. (Ex. N at 6–7).

Q: And at the time that she left the hospital, what was her condition?

A: I would say that she was about maybe 10–20% improved. She was much better physically. She was eating, was dressing, was cooperating with the basic self-care. She was probably not hallucinating. . . . [She] was verbally agreeing to continue followup care outside of the hospital. Unfortunately, she didn't keep that agreement. (*Id.* at 7).

Q: Did you form your opinion that she was at the time suffering from acute schizophreniform disorder to a reasonable degree of scientific [certainty] in your opinion?

A: Yes. (*Id.* at 8).

[L.L.'s parents] contacted me when she immediately went back on her agreement to come back to the office and refused to follow up with treatment. They contacted me, and I advised forcible rehospitalization, which they refused and declined, and over the next week or two in October they were in contact with me almost every day giving—me giving them advice as to how best to handle it at home, and then it was all through the month of November I had no contact with them at all, and then in December we had two

phone calls in which they communicated to me the latest being as of last night that she's about 10% better than when she became sick. In other words, she had slipped back. She was about 20% better when she came home from the hospital. She slipped back about 15 of that percent, approximately. I'm just guessing of course here, and she had gradually recovered maybe 5% more. So that she is able to eat and dress herself and will join the family in the main rooms of the house, which she did not do before admission, and will occasionally go out of the house, but does not participate in any of the ordinary activities that she used to do before.

Q: If she is not treated by herself or any other psychiatrist, will she ever recover?

A: I really couldn't say. If this father's report is accurate and that she has improved some without active treatment, psychiatric treatment, just with the family's support, then it is possible that she would continue to improve over the x number of years, maybe two or three, maybe five or ten, and perhaps eventually recover spontaneously in that manner. It also is very common for such people to improve to a certain point and then plateau off and never recover the previous ability to function. It is also possible, of course, that she will reverse her stand and seek active help, and hopefully that would be successful and bring her out of it faster. As of right now we have no indication that that would be the case. (*Id.* at 9–10).

Q: Do you have an opinion, sir, as to what the impact on her would be given her current state if we were to apparently force her to come here and testify since she appears to be unwilling to do so?

A: Yes.

Q: And what would that opinion be, sir?

A: My opinion is that it is a high probability that it would cause anywhere from a moderate to a substantial relapse and

return of her symptoms, in her illness in other words. (*Id.* at 11).

As for L.L.'s father, Dr. Busby testified: The father stated that he wouldn't stand in the way if she wanted to go, but he actively campaigned against her testifying and repeatedly informed me that he would not in any way go along with it or tolerate it, and any time she would even talk about it he would interrupt her conversation. He did try to turn it around in saying don't you think it would make her sick, and I said of course I do, but I mean I felt this was his justification. He has some strong opinion that she should not do that.

Q: Would you say that he was being a typical protective father?

A: Yes, yes, very much so. In fact, he was that way almost disturbingly so in the last week of the hospitalization. In fact, I think that's one reason she's not getting treatment now, he will not force treatment on her. (*Id.* at 17).

Q: And also your opinion as to her ability to testify and the possible problems she would encounter if she did would also at least partially be based on the lack of progress that has been reported to you by her parents since October 18?

A: Partially so, yes. (*Id.* at 20).

Q: To what part, doctor, if you can relate does your prognosis relate to what the parents have told you?

A: Well, most of the prognosis in schizophrenia is really based on the nature of the beast, the nature of the illness and its history with hundreds and thousands of other people, and schizophrenia is notable for its difficulty in recovery in general, and when you notice 10 or 20% improvement in a month's time, you naturally get hopeful that if the person follows through maybe you'll beat the bad odds and this is one who'll get well; and that's why it's very frustrating when the family then stands in the way of completing the treatment or following up on the treatment and sort of in effect reduces your prognosis. You have to predict that chances of her getting well are much reduced because of the failure to follow through with treatment afterward. (*Id.* at 21).

I have only quoted a portion of Dr. Busby's testimony. I have, however, reviewed it in its entirety. To say the least, it is confusing. Perhaps because it is so confusing and internally inconsistent, the courts, Judge Zievers, and the Wisconsin Supreme Court majority have, I believe, misstated it.

Obviously, the two important issues here are the severity and probable duration of L.L.'s mental infirmity. The evidence presented on these questions must be reviewed with particular attention to its quality as a predictor of what L.L.'s mental condition would be in March of 1981, when this case went to trial. With this in mind, what were the findings as to severity and probable duration?

To find either severity or duration, we must know what the illness is. And here, we must keep in mind, as noted by the Wisconsin Supreme Court (notes 2 and 3) that schizophrenia and acute schizophreniform disorder are different diseases. Although they have identical manifestations, schizophrenia may last for several years, while acute schizophreniform disorder lasts from two weeks to six months.

Confronted with Dr. Busby's testimony, Judge Zievers stated he was

"... satisfied that ... [L.L.] had been diagnosed and was suffering from *acute schizophreniform disorder* which the court finds continues to exist ... so as to warrant a declaration of unavailability."

As Justice Abrahamson noted in her Wisconsin Supreme Court dissent, it had to be assumed that

"... the circuit court understood the doctor's testimony, the medical terms, and the characteristics of acute schizophreniform disorder before it made a finding of fact that the witness suffered from this particular disorder."

112 Wis.2d at 154, 332 N.W.2d 757.

In criticizing the majority analysis, Justice Abrahamson went on to note:

"Because a finding that the witness's mental illness was short-term is inconsistent with the circuit court's ruling that the witness was unavailable, the majority is compelled to ignore the circuit court's finding of acute schizophreniform disorder (*supra*, p. 136, n. 6 [332 N.W.2d 757]) in order to reach the result it does, that is, upholding the circuit court's ruling that the witness was unavailable. Rather than accept the circuit court's finding of fact as to the nature of the mental illness or infirmity, the majority substitutes its own findings for that of the circuit court. The majority finds the witness suffered from 'schizophrenia' (*supra*, p. 140 [332 N.W.2d 757]) and 'became a catatonic schizophrenic' (*supra*, p. 146 [332 N.W.2d 757])."

I agree with the Wisconsin Supreme Court dissenters, Justice Abrahamson and Chief Justice Nathan Heffernan, that the majority finding that L.L. suffered from schizophrenia and is a catatonic schizophrenic is against the great weight and clear preponderance of the evidence. At best, Dr. Busby's confusing diagnosis supports a finding of acute schizophreniform disorder, not schizophrenia.

Since L.L.'s condition was temporary, the state is not entitled to presume that it will continue. It highlights what should have been obvious here, that L.L. would have to be examined again prior to the start of the trial. *See also Jones v. Nabisco, Inc.*, 95 F.R.D. 25, 26 (E.D.Tenn.1982) (court defers consideration of witness unavailability motion; "even though the prognosis, that Mr. Smith will regain his health to such an extent that he will be able to testify at trial, appears dim at this time, that possibility remains viable. The determination of whether hearsay evidence is admissible under the provisions of Rule 804(b)(5), *supra*, can best be made at trial."); *United States v. Amaya*, 533 F.2d 188, 191 (5th Cir.1976) ("the duration of an illness is a proper element of unavailability"); *United States v. Faison*, 679 F.2d 292, 297 (3d Cir.1982).

Furthermore, the Wisconsin Supreme Court's statement that "there was a high probability of a relapse into her prior symptoms" if she testified, does not find support

in the record. *Id.* 112 Wis.2d at 147, 332 N.W.2d 757. To the extent the Court's statement turned on Dr. Busby's testimony, it is inaccurate because his testimony was erroneously restated. Dr. Busby did not testify that L.L. had a high probability of a relapse. Rather, his testimony was that, based on personal observations made almost five months before trial and without benefit of knowledge that L.L. was actually voluntarily facing her attacker on a daily basis, L.L. may have had only a "moderate" probability of relapse. No matter how much deference may be given to a court's finding, this one simply cannot substantiate a conclusion that at the time of trial L.L. was suffering so much that requiring her to "testify again has a significant probability of worsening the condition."

The Supreme Court's conclusion is also troubling to the extent that it was based on the Court's own reckoning that L.L.'s attitudes toward testifying and toward her attacker, attitudes which may be broadly described as "religious", were symptoms of her mental disease. For a court to venture out on a path of psychiatry upon which it is not qualified to travel is unwise; at best, it risks an erroneous diagnosis. At worst, it gives credence to conduct which might better be viewed as recalcitrance, conduct which a court would not otherwise tolerate. As the court itself wrote, "But, however one may admire or sympathize with her trying to cope by forgiving her attacker, the crime of which this defendant was convicted was also a crime against society and it is society which is also wronged by his actions. Prosecution and punishment of offenders cannot be made contingent on the willingness of their victims to forgive the wrongdoer." 112 Wis.2d at 146–147, 332 N.W.2d 757. Judge Corbett's analysis is also flawed by the same tendency to permit recalcitrance to substitute for an actual diagnosis of mental infirmity:

Now, from that by the evidence that Judge Zievers had had in front of him and which now I have before me in another form from conversations between [L.L.] and Assistant District Attorney Lingle that this lady has expressed a

disbelief in the court system, refuses to take an oath, expressed the belief that it's wrong to punish him, and I'm saying there's no longer the right to take an eye for an eye and a tooth for a tooth, this sort of thing, retribution, it would make anyone in their right mind wonder why should I bring anyone to court in this state who says she won't testify, won't even take an oath and doesn't believe that it's proper and doesn't think the court system is right. Now, she may be right, but the rest of it I don't know.

The only finding made at the time of trial was a finding made on almost no record whatsoever. Judge Corbett made a ruling that L.L. was to remain unavailable based on Judge Zievers' earlier findings. However, a transcript of the proceedings before Judge Zievers was not then available. It appears that Judge Corbett's understanding of Dr. Busby's testimony came from the Assistant District Attorney's recollection of it. It is also possible that this testimony may have been misstated to Judge Corbett. The Assistant District Attorney "informed the court that the witness suffered from 'a schizoid disorder' and that Dr. Busby's prognosis was that 'without psychiatric counseling that it would take approximately 3–4 years before she could recover if she would.'" 112 Wis.2d at 158–159, 332 N.W.2d 757. Furthermore, Judge Corbett ignored evidence that L.L. was again carrying out normal activities, such as communicating, traveling on her own, and, most significant of all, facing her alleged attacker. This factual evidence, as the dissenting Wisconsin Justices pointed out, is consistent with the diagnosis of a mental illness that could have run its course. Id. at 159, 332 N.W.2d 757. Also, Judge Corbett may have shifted the burden of proof from the state (which offered L.L.'s testimony) to Burns to prove L.L.'s "unavailability":

> If there was anything else available I would have expected opposing counsel to bring it forth.... I am not the reviewing court for Judge Zievers. In order for me to do anything thoroughly with this subject I would have to hear it practically anew as of this time. I so indicated at

the scheduling conference. I agreed to hold such a hearing if the people were brought here. Again, so no fault can be found on the record with you, Mr. Bramscher, I am aware of the fact that you attempted but were not able to make any contact with these people.

All in all, the course of events in this case leads me to believe that the state did not meet its "good faith" duty to procure the testimony of L.L. or to prove at the time of trial her unavailability. In *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), the court wrote: "In short, a witness is not 'unavailable' for purposes of the foregoing exception to the confrontation requirements unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial. The state made no such effort here, and, so far as this record reveals, the sole reason why Woods was not present to testify in person was because the state did not attempt to seek his presence. The right of confrontation may not be dispensed with so lightly." *Id.* at 724–725, 88 S.Ct. at 1321–1322. Simply stated, the state did not take "reasonable", *see Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543, steps to make L.L. available at Burns' trial. The crucial fact underlying this belief is that the state actually attempted, after it learned that L.L. was visiting Burns in prison, to procure L.L.'s presence at trial. The Assistant District Attorney subpoenaed L.L. and then discussed her cooperation over the phone with L.L. However, the prosecutor's attempts were rebuffed. L.L. read passages from the New Testament relating to forgiving one's brothers, and told the Assistant District Attorney that "if you have a dispute with your brothers you're not to go to the courts but rather you're to confront your brother with the wrong and if your brother admits it and you can settle it between yourselves then you are to forgive your brother and you will be forgiven in heaven, or something like that." She quoted other passages stating that there should be "no lawsuits before pagans, and that she did not believe in the court system, and she was not going to testify" because she

had forgiven the defendant. After this, the state elected not to seek enforcement of L.L.'s subpoena, and instead rely on her earlier testimony. It would seem that this path was taken not because of a "then existing ... mental illness" but because the state had an uncooperative witness on its hands.

For the foregoing reasons, I conclude that the continued reliance on a finding of "unavailability," a finding made on a confused and stale record, and the resulting use of L.L.'s previous testimony instead of her live appearance at trial, deprived Burns of his Sixth Amendment right to confront a witness against him. Having so found, I turn to the next question: What consequences flow from the denial of a right in this case?

Just as the hand, the ear and the heart are parts of the body, the confrontation clause is made up of different components. The clause serves three basic purposes: (1) that the testimony of the witness be under oath; (2) that the witness be subjected to cross-examination; and (3) that the witness be present so that the jury may observe his or her demeanor. *See California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970). Like the hand, ear and heart, however, the components of the confrontation clause differ in importance. Without question, the ability to cross-examine, like the heart, is paramount. In fact, confrontation is almost synonymous with cross-examination. It is the touchstone of the right. *See* 5 Wigmore, *Evidence* §§ 1395–96, pp. 150–55. As Professor Wigmore states in his treatise:

"The question, then, whether there is a right to be confronted with opposing witnesses is essentially a question whether there is a right to cross-examine. If there has been a cross-examination, there has been a confrontation. The satisfaction of the right of cross-examination ... disposes of any objection based on the so-called right of confrontation.

"Nevertheless, the secondary advantage, incidentally obtained for the tribunal by the witness' presence before it—the de-

meanor-evidence—is an advantage to be insisted upon whenever it can be had. No one has doubted that it is highly desirable, if only it is available. But it is merely desirable. Where it cannot be obtained, the requirement ceases. It is no essential part of the notion of confrontation; it stands on no better footing than other evidence to which special value is attached; and just as the original of a document ... or a preferred witness ..., may be dispensed with in case of unavailability, so *demeanor-evidence may be dispensed with, in necessity*. Accordingly, supposing that the indispensable requirement of cross-examination has been satisfied, the only remaining inquiry is whether the demeanor-evidence, to be obtained by the witness' production before the tribunal, is available."

*Id.* at § 1396, pp. 154–55 (footnote and citations omitted, emphasis in original). Professor Wigmore analyzes this question further, stating:

"There never was at common law any recognized right to an indispensable thing called confrontation *as distinguished from cross-examination*. There *was* a right to cross-examination as indispensable, and that right was involved in and secured by confrontation; it was the same right under different names. This much is clear enough from the history of the hearsay rule ..., and from the continuous understanding and exposition of the idea of confrontation .... It follows that, if the accused has had the benefit of cross-examination, he has had the very privilege secured to him by the Constitution.

*Id.* at § 1397, p. 158 (footnote and citations omitted, emphasis in original). *Also see California v. Green*, 399 U.S. at 160–61, 90 S.Ct. at 1936.

In this case, the testimony of L.L. that the jury heard had been given under oath in a court of law. She was cross-examined extensively, particularly on the issue of identification. Thus two of the three, including the most important, as-

pects of confrontation were present here. The only missing piece is the ability of the jury to observe, judge the demeanor if you will, of L.L. in the courtroom. In this case, that deficiency is harmless beyond a reasonable doubt.

Assume for a moment that L.L. were dead when this case came to trial. Under 908.04(1)(d), she would have been legally unavailable. Her preliminary hearing testimony would obviously have been admissible under 908.045(1). The fact that the jury could not see her and judge her demeanor would be of little moment. Necessity would allow her former testimony to be used.

Other examples are abundant. Had L.L. appeared at the trial and refused to testify, she would have been "unavailable" under 908.04(1)(b), and her former testimony would have been used. If the state simply could not, despite a good faith effort, find her, she would have been "unavailable" under 908.04(1)(e), and her former testimony would have been received.

In all of these examples, the right to observe the witness while testifying is sacrificed. Necessity, of course, is the reason. In this case the state cannot point to necessity, but the examples demonstrate that the aspect of confrontation missing here is not to be given the same significance as other aspects of the clause, most importantly, cross-examination. Had there not been a preliminary hearing, the state would have been out of luck. Even a handwritten or videotaped statement of L.L. could not have been used because there would have been no cross-examination. So an aspect of the right to confront was abridged, however, Burns had previously had the opportunity to vigorously and thoroughly probe L.L.'s testimony through cross-examination.

Just for the sake of argument, I turn to some speculation as to what would occur if this case were retried. If L.L. was again found to be unavailable, the transcript would again be read, and a reasonable jury would convict, as the first one did. If L.L. was available and testified in accordance with her prior testimony, there is no doubt, again, that Burns would be convicted. The only issue raised at trial and at the preliminary hearing was identification; there is ample evidence in the record linking Burns to the attack of both women. On the other hand, if L.L. would, for any reason (including religion), decline to testify, the transcript testimony would be used, either to refresh her memory, or as substantial evidence against Burns, or both. Again, a jury would be faced with the same evidence which the first jury found sufficient to convict Burns. In addition, if L.L. took the stand and said things like "I forgive him" etc., the natural question would be "what for?" An experienced prosecutor would have little trouble drawing damaging testimony from L.L. that would probably hurt Burns more than he claims her absence did. Considering the "probable impact of the [error] on the minds of an average jury", *cf. Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), *cited in Mattes v. Gagnon*, 700 F.2d 1096, 1105 (7th Cir.1983), I do not believe that it would do anything different.

Is it fair to engage in speculation? I do not engage in it lightly, nor am I unaware of those who caution against it. *See, e.g., United States ex rel. Raymond v. People of State of Illinois*, 455 F.2d 62, 75 (7th Cir.1972) (Pell, J., dissenting and concurring) ("the result of the jury's verdict might have been the same with this evidence before it but for us to say so could only be on a basis of speculation.... In other words, I am unable to declare a belief that it was harmless beyond a reasonable doubt."). However, I am persuaded that the speculation which I engage in is not unfair. I believe that it is justified by the factual background of this case. In so speculating, I believe I am doing so within the spirit of *Rosenberg v. United States*, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (195( ), in which Justice Frankfurter wrote:

An appellate court should not confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled. However, when the very same information was possessed by

defendant's counsel as would have been available were error not committed, it would offend common sense and the fair administration of justice to order a new trial. There is such a thing as harmless error and this clearly was such.

*Id.* at 371, 79 S.Ct. at 1234. Since I do not believe it is unfair to speculate what might happen at a trial if L.L. was present, I believe that this case is the converse of cases such as *Clancy v. United States,* 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961), in which it was held that the harmless error doctrine must be strictly applied, since courts cannot "speculate whether [Jencks material] could have been utilized effectively" at trial. *See also Goldberg v. United States,* 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348 n. 21, 47 L.Ed.2d 603 (1976). Here, the issue was identity, not that a brutal assault did not occur. It is not the kind of case where credibility or honesty of the witness is put in serious question. Were this the kind of case where the ability of the jury to "see" the witness, or "size her up," like an accomplice case or one where the defense had valuable impeaching tools to use (prior conviction, bias, or prejudice, for example), the absence of the live witness on the stand would take on greater significance. Here, on the issue of identification, it doesn't. All of this leads me to the inescapable conclusion that although a constitutional error was committed, it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Not only was the error harmless but, in the real world, it was the defendant who benefited from L.L.'s nonappearance. It was to his advantage to have the sordid details of these brutal acts read to the jury by a disinterested person from a cold transcript. If anyone was harmed by L.L.'s nonappearance, it was the state. Certainly, the state stood to benefit from any jury sympathy and outrage which conceivably could have been aroused if L.L. appeared and testified in detail about the events.

For the reasons stated, the petition for a writ of habeas corpus is DENIED.

SO ORDERED.