Charles R. BURNS,
Petitioner-Appellant,

v.

Donald CLUSEN, Respondent-Appellee.

No. 85–1126.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1985.
Decided Aug. 4, 1986.

Steven D. Phillips, Asst. State Public Defender, Madison, Wis., for petitioner-appellant.

Daniel J. O'Brien, Asst. Atty. Gen., Bronson C. LaFollette, Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for respondent-appellee.

Before CUDAHY and RIPPLE, Circuit Judges, and SWYGERT, Senior Circuit Judge.

SWYGERT, Senior Circuit Judge.

The issue in this appeal from a denial of habeas corpus petition is whether the petitioner's sixth amendment right to confrontation was violated in his state court trial and, if so, whether the violation was harmless beyond a reasonable doubt. We hold

that there was a violation, but that the application of the harmless error doctrine requires us to affirm the district court.

This case involves charges arising from two separate incidents, both of which occurred on the same day, and in which M.S. and L.L. were participants.[1] The first took place about 1:00 a.m. on May 6, 1980, at which time M.S. was confronted outside her Kenosha, Wisconsin apartment by a man with a gun who forced her into her car and told her to drive to a parking lot, where she intentionally collided with garbage cans enabling her to escape. M.S. positively identified Burns, who was wearing an old Army jacket with a patch, as her assailant.

In the late evening of the same day, within the same vicinity, L.L. was a customer in a restaurant. Upon walking out to the parking lot, she was accosted by a man who drew a gun, forced her into a car, and ordered her to drive to a secluded area. There he put a gun to her head and pulled the trigger, proceeded to sexually assault her, and attempted to choke her with a wire. She called out the name "Jesus" to save her. Before the assailant left, he robbed L.L. of the money in her purse and beat her about the head with the butt end of his gun.

L.L. identified the petitioner as her assailant, picking out his photo from those offered her to view at the police station several days after the assault. Police recovered petitioner's jacket from his residence; the blood stains on it matched L.L.'s blood type (a rare AB found in only three percent of the population). Petitioner's face had been scratched; L.L. testified that she scratched her assailant while trying to escape.

On May 22, sixteen days later, L.L. testified on direct examination at the preliminary hearing. The hearing was continued to May 27, at which time she was cross-examined by defense counsel. Cross-examination on the issue of identity was exhaustive; L.L. adhered to her positive identification of petitioner as her assailant.

Following the events leading up to the preliminary hearing, this case involves attempts to bring L.L. to court to testify as a material witness. In August 1980 the prosecutor telephoned L.L. and asked her to appear in court; a defense investigator also contacted L.L., as did a Kenosha County Sheriff's Department officer. L.L. refused, stating that she had forgiven the petitioner and that the Bible required her to "turn the other cheek." The prosecutor made arrangements to have L.L. arrested and extradited from Illinois as a material witness, but she abandoned the effort after learning of L.L.'s hospitalization.

On September 17, 1980 L.L. was admitted to the psychiatric ward of a Niles, Illinois hospital. Her treating psychiatrist, Dr. David Busby, described her upon admission as

> almost like a basket case ... catatonic stupor with hallucinations and delusions ... would stand in one spot and talk to the wall, refuse to eat.

. . . . .

> Apparently part of the sickness was to stand in one place and call upon Christ Jesus to save her ... as she began to get better, we found that this was a flashback to her previous experience at the time of the alleged assault when she had also called out for Christ Jesus to save her.

She was given medical treatment, including intravenous feedings and drugs, and discharged October 18, 1980 pursuant to the hospital's policy limiting a patient's stay in the "acute treatment ward" to one month. Dr. Busby recommended transfer to another hospital for longer term care, but L.L.'s parents insisted on caring for their daughter at home.

At the time of L.L.'s discharge, the doctor estimated that her condition had improved ten to twenty percent: "much better physically, eating, dressing, communicating, probably not hallucinating, no longer merely standing in a room holding her Bible and crying or calling out for Jesus."

1. The state courts have referred to the two women by their initials, and we will do the same.

She agreed to pursue outpatient treatment but did not abide by the agreement. The doctor characterized L.L.'s father as "disturbingly protective" and testified that the father refused the doctor's recommendation of long term hospitalization.

The doctor's last personal contact with L.L. was on October 18. During the month of October, however, L.L.'s parents consulted with the doctor by telephone almost every day, and during one of the conversations Dr. Busby spoke briefly with L.L. who said that she "did not need re-hospitalization." In December 1980 he spoke twice with the parents, the last call being the night before the hearing.

Given these events, on November 4, 1980, the State sought an order declaring L.L. unavailable to testify at trial. The motion was filed December 5; it was accompanied by the prosecutor's affidavit concerning her earlier telephone conversation with L.L. A hearing on this motion was held on December 9, at which Dr. Busby testified that he had had no direct personal contact with L.L. since October 18—or almost two months. Dr. Busby diagnosed L.L. as "schizophreniform disorder," and later referred to "schizophrenia." He was of the opinion that if L.L. was forced to testify at trial there was a "high probability that it would cause anywhere from a moderate to substantial relapse and return of symptoms." The defense counsel did not offer expert testimony to counter the doctor's testimony.

The state court judge did not immediately rule on the State's motion, but continued the matter until January 16, 1981. At the hearing Burns testified that on the preceding Sunday a Bible was delivered to him at the jail with a letter from L.L., in which L.L. requested that he place L.L.'s name on the visitor's list at the jail, write to her, and "accept the Lord into his life." She offered to visit him, and she did so on two occasions the following week.

At the conclusion of the continuation hearing, the judge ruled that L.L. was unavailable to testify within the meaning of Wisconsin Rule of Evidence § 908.04(1)(d), stating that her "schizophreniform disorder" was extant at the time of his ruling. Although the originally-scheduled trial date was to be held within a few days, in fact the case was twice postponed and finally reassigned to Reserve Judge Corbett.

The trial was first set February 23, 1981. At that time, the State filed a motion *in limine* to prohibit defense counsel from offering evidence of any contact between L.L. and the defendant. The court granted the State's motion, stating that defense counsel had indicated he wished to confer with L.L.'s parents prior to making any determination about L.L.'s availability for appearance in court, and the court indicated it would await that determination. The court further stated that, if requested, it would conduct a hearing outside the presence of the jury for the purpose of determining the appropriateness of L.L.'s testifying and also indicated that it would be helpful to have the assistance of medical or psychiatric personnel to aid in the determination of L.L.'s physical and mental condition. The defendant did not attempt to have L.L. present at such a hearing or offer expert testimony.

When the trial began on March 2, 1981, Burns' counsel urged Reserve Judge Corbett to review Judge Zievers' decision with regard to the court appearance of L.L.; Judge Corbett refused. The next day Burns testified that L.L. had been visiting him at the jail twice a week, most recently 2½ weeks prior to the trial, and defense counsel moved to exclude L.L.'s preliminary hearing testimony. Petitioner's father testified that he had been present during one of these meetings. He said L.L. told him she was working as a nurse's aide, was preparing to enter nursing school, and "felt good." He stated that L.L. did not appear to be mentally ill. The prosecutor also testified, indicating that after she learned of L.L.'s visits to the jail, she subpoenaed L.L. and actually served a subpoena upon her during one of those visits. However, a subsequent telephone conversation with L.L. convinced the prosecutor not to enforce the subpoena and to rely on the

previous court ruling that L.L. was "unavailable."

The court denied petitioner's motion and noted that the defense counsel had not subpoenaed L.L. or her parents, or proved that she had actually entered nursing school. The judge reiterated that he had agreed to hold a hearing on the unavailability question if the defendant wished to challenge the judge's ruling. However, he emphasized that the petitioner had introduced no professional testimony to prove that L.L. no longer suffered from mental illness. L.L.'s preliminary hearing testimony was thereupon received into evidence by the trial court. M.S. was present in court during the trial and identified Burns as her assailant; she was subject to cross-examination by defense counsel.

At the close of trial, the petitioner was convicted of all five counts. An appeal was certified directly to the Wisconsin Supreme Court, which denied relief to the petitioner. The dissenting votes in that appeal argued that the doctor's testimony was "stale," that the burden of demonstrating L.L.'s unavailability had seemingly been placed on petitioner, and that the state had failed to prove that L.L. was unavailable at time of trial. The district court denied a petition for writ of habeas corpus, holding that while petitioner's sixth amendment right to confrontation had been violated, it was harmless error. An appeal is now taken to this court.

## I

We are confronted with the complicated relationship between the Confrontation Clause and the hearsay rule. The Supreme Court has never had occasion to consider the precise question before us: When is a witness unavailable because of mental illness so as to make admissible her preliminary hearing testimony? The Court, however, has developed a basic framework for such consideration.

The primary interest secured by the sixth amendment is the right of cross-examination, the face-to-face confrontation at trial. *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). The provision of the Confrontation Clause that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him" stands as a bar to *"ex parte* evidence" by affidavit. This right to confront one's accusers is a fundamental right, made applicable to the states by the fourteenth amendment's Due Process Clause. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

The Wisconsin Constitution, Art. I, § 7, provides that the accused shall enjoy the right to meet the witnesses face to face. As the Wisconsin Supreme Court explicitly recognized, the rights granted under the Confrontation Clause of the State and Federal Constitutions are identical. *State v. Burns*, 112 Wis.2d 131, 144, 332 N.W.2d 757 (1983).

Although the Confrontation Clause and the hearsay rule are generally designed to protect similar values, they are not congruent and stand in some tension. More than once courts have found violation of confrontation values even though the testimony was admitted under a recognized hearsay exception. *California v. Green*, 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970). On the other hand, courts have declined to apply the Confrontation Clause so literally as to reach the extreme result of abrogating virtually every hearsay exception. *United States v. Inadi*, ── U.S. ──, 106 S.Ct. 1121, 1125, 89 L.Ed.2d 390 (1986); *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980).

In order to accommodate these competing interests, the Court has developed a two-part approach. First, in conformance with the Framers' preference for face-to-face accusation, the sixth amendment establishes a rule of necessity. Generally, the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it desires to use against a defendant. *Id.* at 65, 100 S.Ct. at 2538. The prosecution must make strin-

gent efforts to show that a declarant is unavailable. *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

Second, to augment accuracy in the fact-finding process by ensuring the defendant an effective means to test adverse evidence, the Confrontation Clause countenances only such hearsay as is marked by adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases the evidence must be excluded, absent a showing of particularized guarantees of trustworthiness. *Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539.

The Federal Rules of Evidence and Wisconsin hearsay rule are in accord with this two-part analysis. Fed.R.Evid. 804(a)(4) defines "unavailability" as a witness to include a person unable to be present or to testify at the hearing because of death or "then existing" physical or mental illness or infirmity. The Wisconsin law on this point is the same as federal law. Wis. Stats. § 908.04(1)(d). Whether a witness is "unavailable" is a preliminary question or predicate for admissibility of prior recorded testimony under Fed.R.Evid. 804(b)(1) or Wis.Stats. § 908.045(1) (1979–80). 4 Weinstein & Berger, *Evidence*, ¶ 804(a)[01] and ¶ 804(b)(1)[01] at 804–35 (1981).

Although former testimony at a preliminary hearing benefits from certain guarantees of reliability that other hearsay statements lack (*e.g.*, being made under oath, in writing, under circumstances suggesting the need for care and accuracy, subject to an adequate opportunity for cross-examination), the trier of fact cannot observe the demeanor of the declarant. Additionally, a preliminary hearing (and cross-examination completed at it) is ordinarily a much-less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial. *Barber v. Page*, 390 U.S. at 725, 88 S.Ct. at 1322. Thus the Federal Rules and Wisconsin law express a preference for live testimony if possible, and ad-

mission of hearsay statements under certain exceptions only as an alternative to losing all evidence from that source. *Inadi*, 106 S.Ct. at 1126.

In the case before us, the petitioner concedes that because his counsel cross-examined L.L. at the preliminary hearing, her former testimony has the required indicia of reliability and meets the second test. L.L.'s former testimony is unmarred by inconsistencies or suggestions of unreliability. *Compare, United States ex rel. Haywood v. Wolff*, 658 F.2d 455, 464–66 (7th Cir.1981). In the instant case, if L.L. was truly "unavailable," her testimony at the preliminary hearing meets both parts of the constitutional test and was clearly admissible.

■ The burden of proving the unavailability of the witness rests upon the party offering the prior testimony. If there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation. *Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543. The lengths to which the prosecution must go to produce a witness is a question of reasonableness. *California v. Green*, 399 U.S. 149, 189 n. 22, 90 S.Ct. 1930, 1951 n. 22, 26 L.Ed.2d 489 (1970).

■ In a situation where the State argues that a witness is unavailable because of mental illness, the judge must consider both the duration and the severity of the illness. With regard to duration, it is not essential to a finding of unavailability that the illness be permanent. The duration of the illness need only be in probability long enough so that, with proper regard to the importance of the testimony, the trial cannot be postponed, *United States v. Amaya*, 533 F.2d 188, 191 (5th Cir.1976), citing 5 Wigmore, *Evidence* § 1406(a) (Chadbourn rev.1974). In the case of a mental rather than a physical disability, the trial judge's task is more difficult because there is often greater uncertainty as to the prognosis. *Parrott v. Wilson*, 707 F.2d 1262 (11th Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). A judge must

weigh the desirability of a speedy trial against the possibility that a further delay may find the declarant competent.

As to severity, mental illness itself may not automatically render a witness unavailable. The judge must consider the symptoms, what tasks a witness is then capable of. While all victims of violent crimes may suffer emotional trauma, some victims may suffer far greater anguish than normally accompanies court appearances. *See, e.g., Warren v. United States,* 436 A.2d 821, 828–29 (D.C.App.1981) (two psychiatrists independently conclude that if a rape victim were forced to testify, the probability of severely incapacitating psychological injury was high because her depression had reached suicidal levels).

■ Given those considerations, there is no question that L.L. was unavailable in early September 1980, at the time the prosecutor made arrangements to have L.L. arrested and extradited. The prosecutor reasonably abandoned the effort to produce L.L. when she learned of L.L.'s hospitalization. L.L.'s mental condition at the time of admission to the psychiatric ward was undoubtedly severe—"catatonic stupor with hallucinations and delusions," and recovery in the near future was speculative.

But at the time the State filed a motion seeking an order declaring L.L. unavailable, and a hearing was held on December 9, 1980, Dr. Busby had had no direct personal contact with L.L. since her discharge from the hospital on October 18, 1980. Moreover, at the hearing Dr. Busby offered his diagnosis as "acute schizophreniform disorder," but also referred generally to the term "schizophrenia." Under the DSM–III (*Diagnostic and Statistical Manual of Mental Disorders (3d ed.)*), which had become the new standard for psychiatric evaluation in July 1980, "schizophreniform disorder" was a new diagnostic category whose essential features were identical to those of schizophrenia with the exception that the duration (including the active and residual phases) was less than six months and more than two weeks. According to the Manual, schizophreniform disor-

der is classified outside schizophrenic disorders because evidence suggested a tendency toward acute onset and resolution and more likely recovery to premorbid levels of functioning. Thus, if L.L.'s illness began no later than mid-September 1980 (when she was hospitalized), then by definition it would have lasted no longer than mid-March 1981, which is approximately the time the petitioner's trial began.

Dr. Busby's testimony may well have reflected some confusion on the precise use of the new diagnostic terminology, given the recent change in standard. Unfortunately, the distinction between the diagnoses of schizophrenia and acute schizophreniform disorder is not semantic, but substantive. The state court judge, nevertheless, did not resolve the inconsistency in the doctor's testimony. Nor did defense cross-examination pursue the apparent contradiction, or present opposing medical testimony, or offer oral argument or discussion. Instead, the petitioner's counsel asked the court whether the hearing could be adjourned following Dr. Busby's testimony and rescheduled for a conference at a future date.

The judge did not immediately rule on the State's motion, but continued the matter until January 16, 1981. At the hearing the petitioner testified that L.L. had written to him and offered to visit him at the jail. Trial judge Zievers then ruled at the conclusion of the hearing that L.L. was unavailable to testify within the meaning of Wisconsin Rule of Evidence § 908.-04(1)(d), and that he was

> [s]atisfied that ... [L.L.] had been diagnosed and was suffering from *acute schizophreniform disorder* up to and including the date of her discharge ... [and] that the *acute schizophreniform disorder* on the state of the record continues to be extant and within the meaning of the pertinent provision of the statute so as to warrant a declaration of unavailability. (emphasis added)

That finding was potentially inconsistent with his ruling that L.L. was unavailable for trial in the future. Although Judge

Zievers never made any explicit finding with regard to the possible duration of L.L.'s illness, he made a factual finding that assumed implicitly (by its use of a specific medical term) that the witness' mental illness was short-term. To compound the problem, Reserve Judge Corbett later adopted the earlier finding and made his own finding based on almost no record. Judge Corbett could not review Dr. Busby's testimony because a transcript of that testimony had not yet been prepared. Instead the judge relied on the prosecutor's brief oral summary of L.L.'s testimony, which, as the Wisconsin Supreme Court dissent pointed out, was inaccurate in several important respects.[2]

██ No findings on the basis of up-to-date evidence were made with respect to the witness' physical or mental conditions at or about the time of trial, even though the time interval between the medical examination of the witness and the determination of unavailability is highly relevant. *United States v. Benfield*, 593 F.2d 815, 817 n.4 (8th Cir.1979); *Sheehan v. State*, 65 Wis.2d 757, 765–66, 223 N.W.2d 600 (1974). If the diagnosis of L.L. was of a short-term "schizophreniform disorder," the trial judge had to consider whether the court should grant a continuance to allow the witness to testify. 5 Wigmore, *Evidence* § 1406, p. 119 (Chadbourn rev. ed. 1974).

██ Judge Corbett's reliance on a second-hand recital of Dr. Busby's testimony was particularly detrimental to the accuracy of his findings because of L.L.'s activities in January and February of 1981, activities which Dr. Busby could not have been aware of when he testified in early December. The fact that L.L. was visiting Burns face-to-face at the jail was relevant to Dr.

Busby's earlier determination that there was a "high probability" of a "moderate to a substantial relapse" if L.L. were forced to testify (and thereby had to confront Burns in person in the courtroom).

██ Certainly, the significance of L.L.'s visits to the jail was not lost on the prosecutor, who decided to subpoena L.L., despite the earlier finding of unavailability. However, the prosecutor then decided not to enforce the subpoena after she talked with L.L. and learned of L.L.'s views with regard to testifying at trial. These actions by the prosecutor, two weeks before trial, evinced a lack of a "good faith effort" on the part of the State to secure L.L.'s presence at trial. Such actions suggested, instead, that the State elected not to seek enforcement of L.L.'s subpoena because it had an uncooperative witness on its hands. There is evidence that Judge Corbett implicitly found the witness unavailable because she was reluctant to testify, not because she suffered from a then-existing mental illness.[3]

The Wisconsin Supreme Court, reviewing these inconsistent and flawed lower court findings, was forced to pick and choose in an effort to create some coherency. As Judge Abrahamson points out in her dissent criticizing the majority analysis, the Wisconsin Supreme Court majority could not accept the circuit court finding of fact as to the nature (and, thereby, duration) of L.L.'s mental illness and still reach the result it did. Rather, the majority substituted its own finding. The court agreed that schizophrenia and acute schizophreniform disorder were different diseases, with different lengths of manifestation. Yet, though it has to be assumed that the circuit court understood the doctor's testimony, the medical terms, and the characteristics

---

**2.** The assistant district attorney, without the benefit of a transcript and not under oath, informed the court that the witness suffered from a "schizoid disorder" and that Dr. Busby's prognosis was that "without psychiatric counseling it would take approximately three to four years before she could recover if she would." *State v. Burns*, 112 Wis.2d 131, 158–59, 332 N.W.2d 757 (1983).

**3.** The circuit judge stated that he would be "out of his cotton-picking mind" if he "blamed the district attorney or the assistant district attorney for not bringing her in when she said she's going to refuse to testify and didn't believe in the whole system and the fact that she has now forgiven this man and the Bible tells her so." *State v. Burns*, 112 Wis.2d 131, 162, 332 N.W.2d 757 (1983).

of acute schizophreniform disorder before it made its finding, the Wisconsin Supreme Court was forced to ignore that finding. The majority found that the witness suffered from "schizophrenia" and "became a catatonic schizophrenic." *State v. Burns*, 112 Wis.2d 131, 136, 146, 332 N.W.2d 757 (1983).

The Wisconsin court majority evaluated the discrepancies in medical terminology and concluded that "the record clearly shows" that Dr. Busby expected L.L.'s recovery to take a minimum of two years (consistent with schizophrenia). But, Dr. Busby never referred to L.L.'s illness as "schizophrenia"; instead, he merely spoke in general terms concerning schizophrenia and the difficult recovery period from this disease. He remarked generally about L.L.'s prognosis without modifying or retracting his initial diagnosis of "acute schizophreniform disorder."

At best, Dr. Busby's confusing diagnosis supports a finding of acute schizophreniform disorder, not schizophrenia. At the time she left the hospital, L.L. had improved twenty percent by Dr. Busby's testimony, and she gradually recovered about five percent more. Dr. Busby testified that "it is possible that she would continue to improve over 'X' number of years ... and perhaps eventually recover spontaneously in that manner." As Dr. Busby said, "schizophrenia is notable for its difficulty in recovery, and when you see ten or twenty percent improvement in a month's time, you get hopeful that this is a patient who will get well." *Id.* 112 Wis.2d at 153, 332 N.W.2d 757; transcript of Dr. Busby's testimony, p. 21. The Wisconsin Supreme Court made its own finding that the recovery period would last a minimum of two years based on nothing explicit or implicit in the record, and it did so in the face of recent personal visits by L.L. to the jail, her traveling outside her home, and her alleged statements to Burns about getting a job, all functions which she was unable to perform at the time Dr. Busby testified.

The Wisconsin majority was taking a foray into its own psychiatric analysis of L.L.

That is a risky undertaking for a court, for which it is not uniquely qualified. Most troublesome here is its finding that L.L.'s attitudes towards testifying, which she described as "religious," were symptoms of a mental disease. The majority speaks of L.L.'s seeking "refuge in her religion from the haunting shadows of her experience," and her "pitiable letters and visit to him in the jail ... the product of a mind rendered seriously ill due to the defendant's assault upon her." *Id.* 332 N.W.2d at 765. The Wisconsin Supreme Court may well be right that L.L.'s stated religious objections to testifying represented a serious mental illness and not spiritual conviction. But making a finding in such a sensitive and complex area is difficult enough at any time and should not be attempted on the basis of a months-old, inconsistent record and a lack of up-to-date expert medical testimony.

■ That brings us, inevitably, to the question of what deference we should afford to the state court findings in this case. The findings of fact of state courts in habeas actions shall be presumed to be correct unless the federal court, on consideration of the record as a whole, concludes that such factual determinations are not "fairly supported" by the record. 28 U.S.C. § 2254(d)(8). That rule applies equally to findings of trial courts and appellate courts. *Sumner v. Mata*, 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981) (per curiam); *Wainwright v. Goode*, 464 U.S. 78, 104 S.Ct. 378, 342, 78 L.Ed.2d 187 (1983). The presumption of correctness applies to the "subsidiary facts" underlying the ultimate conclusion. *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (per curiam). It applies as well to the inferences that can be deduced from the facts. *Marshall v. Lonberger*, 459 U.S. 422, 435, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983). The statute requires the federal courts to show a "high measure of deference" to the factfindings made by the state courts. *Sumner*, 455 U.S. at 598, 102 S.Ct. at 1307.

In the instant case, the subsidiary facts are the determinations that L.L. was suffering from a "then-existing mental illness" at the time of trial, and the facts as to the severity and probable duration of her mental infirmity. These are the "basic, primary, or historical facts 'in the sense of a recital of external events and the credibility of their narrators.' ..." *Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980) (quoting *Townsend v. Sain*, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755, n. 6, 9 L.Ed.2d 770 (1963)).

■ Although findings of historical fact by a state court are presumed correct and normally merit federal court deference, the legal conclusions drawn by state courts from those historical facts on the federal constitutional question raised are subject to independent review in this court. *Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). In the same fashion, "mixed" questions of law and fact are subject to independent federal review. *See Nash v. Israel*, 707 F.2d 298, 301 (7th Cir.1983). Where the question is mixed, the federal court may give a different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard. *Sumner*, 455 U.S. at 597, 102 S.Ct. at 1306.

■ The finding of "unavailability" in this case has more resemblance to a "mixed" determination rather than a straight finding of fact. The issue takes on a constitutional dimension of its own when analyzed in the context of the Confrontation Clause, as opposed to simply in the context of Wisconsin hearsay rules. A determination on "unavailability" goes beyond assessments of credibility and demeanor—best made in the trial court and not properly ignored by courts of appeals. *Maggio v. Fulford*, 462 U.S. 111, 112, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983).

The determination necessarily includes the ultimate legal issue at stake. A witness' unavailability is not an external event capable of being measured or observed. *See Townsend v. Sain*, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963). Rather, it is a legal status which arises as a result of external events. Whether a witness is "unavailable" depends upon the standard applied. This court has previously held that the issue of whether petitioner's sixth amendment confrontation right was violated is a mixed question of law and fact and subject to independent federal review. *U.S. ex rel. Scarpelli v. George*, 687 F.2d 1012, 1015 (7th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). Wisconsin also treats unavailability as a "mixed question." *State v. Gollon*, 115 Wis.2d 592, 340 N.W.2d 912, 916 (Ct.App. 1983).

A determination on "voluntariness" of a confession has been held to be a matter for independent federal determination. *Miller v. Fenton*, — U.S. —, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985). Once the underlying factual issue has been resolved, and the moment comes for determining whether, under the totality of the circumstances, the confession was obtained in a manner consistent with the Constitution, the state court judge is not in an appreciably better position than the federal court judge to make that determination. *Id.* 106 S.Ct. at 453. We believe that a determination on the ultimate issue of "unavailability" is analogous.

■ We are fully aware of the imperative of section 2254(d). After an examination of the same evidence on which the state court relied, however, we hold that the state court factual findings are not fairly supported by the record and therefore are not entitled to deference under the exception of section 2254(d)(8).[4] The deter-

---

4. Two other exceptions to section 2254(d) are also potentially relevent:

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing.

mination on the subsidiary factual issue of whether L.L. was suffering from a "then-existing mental illness" at the time of trial, sufficiently severe and of long-enough probable duration so as to make continuance inappropriate, was based on inconsistent and out-of-date information. Although that determination may have been presumptively correct if it had been made following a recent unavailability hearing, it was *not* presumptively correct based on the stale factual information available to the court.

In fact, Judge Corbett did no more than defer to the prosecution's brief oral summary of Judge Zievers' original findings, and the Wisconsin Supreme Court restated them a second time (ignoring the single most important finding Judge Zievers made—that L.L. suffered from acute schizophreniform disorder). Additionally, in December 1980 Dr. Busby did not and could not answer the crucial questions which determine whether a witness has a mental illness that would render her unavailable. What were the nature and severity of L.L.'s illness at that time? What were the symptoms? What tasks was she capable of performing? We cannot accord the presumption of correctness to Judge Corbett's "findings" at the time of trial (or the higher court's summary) when they are not fairly supported by necessary contemporary data.

▊▊ Because "unavailability" is a mixed question of law and fact, section 2254(d) mandates deference only insofar as there are presumptively correct findings which support the ultimate legal conclusion that L.L. was an unavailable witness at the time of petitioner's trial. Concluding as we do that the underlying state court findings are not fairly supported by the record, we offer our own independent, plenary review

of whether L.L. was "unavailable." *See Miller v. Fenton*, — U.S. —, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985). For the reasons previously outlined, we hold that the State has not fulfilled its burden of proving L.L.'s unavailability as a precedent to offering her prior testimony. The prosecution has neither made stringent efforts to show that L.L. was unavailable, nor produced affirmative proof of L.L.'s actual unavailability at the time of trial in March 1981. Instead we are left with an out-dated prediction, one which may or may not have been accurate on the eve of trial.

A witness cannot be declared "unavailable" simply because the prosecutor or circuit court concludes that the witness might not want to testify. The witness must "persist in refusing to testify concerning the subject matter of [her] statement despite an order of the judge to do so." Wis.Stats. § 908.045(1) (1982). When another individual's liberty is at stake, the decision to allow a witness to be exempt from the public duty to testify must be made by the trial court, not the witness or the state. *State v. Burns*, 112 Wis.2d 131, 163, 332 N.W.2d 757 (1983) (Abrahamson, J., dissenting).

▊▊ A declaration that a witness is "unavailable" because of mental disability cannot be a "back-door" acknowledgment that a witness is simply reluctant or likely to refuse to testify. Rather, the prosecution has the burden to *prove* that the witness has a "then-existing mental illness." It is true in this case that the defense counsel did not take advantage of numerous opportunities to force the State to meet its burden or to aid the court in clearing away confusion.[5] Nevertheless, the burden is not on petitioner to prove that L.L. *was* available. The burden is on the State, and if it fails to meet that burden, the

---

5. Defense counsel did not press in cross-examination to clarify the inconsistencies in Dr. Busby's diagnosis; it did not issue a subpoena to L.L. to secure her presence at trial; it did not introduce opposing expert medical testimony; it did not take advantage of the court's offer to conduct, if requested, a hearing outside the presence of the jury for the purpose of deter-

mining the appropriateness of L.L.'s testifying; it did not subpoena L.L.'s parents to prove that she had entered nursing school; or did it offer any professional testimony to prove that L.L. no longer suffered from mental illness. Reserve Judge Corbett chastised the defendant for these deficiencies, but did not require the State to enforce the subpoena for its chief witness.

judge must either find the witness available, or require the State bring before the court updated information which it requires to make a determination. If a prosecutor secures an early ruling of unavailability, and there is a delay until the start of trial so as to make the earlier information "stale," the obligation remains upon the prosecutor to offer current information proving that the status of the witness' illness has not changed. Because the test is of "then-existing mental illness," the prosecutor cannot rely on an irrebuttable presumption that "once unavailable, always unavailable." In sum, the burden on the State to prove unavailability is a continuing one.

■ In conclusion, our independent review of the state court finding of unavailability in this case leads us to agree with the district court assessment. The finding was made on a confused and "stale" record. The circuit court erred as a matter of law by finding L.L. unavailable as a witness. The resulting use of her previous testimony instead of her live appearance at trial deprived the petitioner of his sixth amendment right to confront a witness against him. Therefore, we affirm the district court holding that petitioner's sixth amendment right to confrontation was violated.

## II

■ Our conclusion that there was a violation of petitioner's right of confrontation does not end our inquiry because constitutional errors of this sort can in certain circumstances constitute harmless error. Finding of a federal constitutional error does not require an automatic reversal of a conviction; there may be some such errors which, in the setting of a particular case, are so unimportant and insignificant that they may be deemed harmless, consistent with the Constitution. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966).

■ The Supreme Court has imposed on the prosecution the burden of proving "beyond a reasonable doubt that the [constitutional] error complained of did not con-

tribute to the verdict obtained." *Id.* 386 U.S. at 24, 87 S.Ct. 828. In the context of trial, the issue is whether absent the constitutionally-forbidden evidence, honest and fair-minded jurors might very well have brought in not-guilty verdicts. *Id.* at 26, 87 S.Ct. at 829. The fact that there was some incrimination or circumstantial evidence does not render the error harmless. *U.S. ex rel. Burke v. Greer,* 756 F.2d 1295, 1302 (7th Cir.1985). Rather, the case against the defendant must be "overwhelming" in order to apply the harmless error rule. *United States v. Shue,* 766 F.2d 1122, 1133 (7th Cir.1985) (amended opinion).

The Court does not vary the harmless error standard with the type of constitutional right at issue, but rather prescribes one standard—the *Chapman* standard. Once a trial error has been identified as one of constitutional magnitude, then the *Chapman* standard is applied to determine whether the conviction must be reversed. *U.S. ex rel. Miller v. Greer,* 789 F.2d 438, 443–444 (7th Cir.1986) (en banc). Confrontation Clause violations are subject to this same analysis. *Delaware v. Van Arsdall,* — U.S. —, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); *Harrington v. California,* 395 U.S. 250, 252, 89 S.Ct. 1726, 1727, 23 L.Ed.2d 284 (1969); *United States v. Key,* 725 F.2d 1123, 1125–27 (7th Cir.1984); *Mattes v. Gagnon,* 700 F.2d 1096, 1104–06 (7th Cir.1983).

■ The inquiry we must conduct is whether an error is harmless in light of a host of factors. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence of absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. *Delaware v. Van Arsdall,* 106 S.Ct. at 1438. Although we are not unmindful of the appropriateness of deferring to the state courts' assessments of the impact of error on state trials, we must conduct our own

examination of the factors the state court relied on.

The only issue in this case is the substantial dispute with regard to the identity of the assailant. In addition to the identification by M.S. as her assailant made at both the preliminary hearing and trial, the State submitted other independent proof that petitioner was the person who committed the assault on L.L.

First, M.S. testified at trial that Burns had committed an abduction of similar nature less than twenty-four hours earlier in the same vicinity (petitioner lived in the area where both crimes occurred). Second, police observed scratches on petitioner's face the day after the incident. The crime laboratory expert testified that the pubic hair found on L.L.'s jeans were not hers and could have been petitioner's pubic hair.

Finally, and most importantly, the police recovered Burns' blood-stained blue denim jacket from his residence the day after the assault. The jacket was similar to the one worn by L.L.'s assailant. The State crime lab expert reported that three of the blood stains on the jacket were of type AB—a strain found in only three percent of the population—and L.L.'s blood type is AB.

Petitioner argues that the use of the harmless error test would entitle Burns to relief because he was convicted on the four counts arising out of the assault on L.L., and L.L.'s preliminary hearing testimony provided the only account of what occurred on the night in question. Without that testimony, petitioner insists, the prosecution would have been unable to prove which, if any crimes were committed, or who committed them. According to petitioner's argument, the remaining State evidence including analysis of the pubic hair and blood-stained jacket and description of L.L.'s injuries had no independent probative value; the evidence could not be linked to any particular offenses without L.L.'s testimony.

Petitioner also asks this court to determine that M.S.'s identification of Burns with regard to the first incident was not reliable enough to convict him of the charge had it not been bolstered by L.L.'s identification. For that reason, petitioner asks that relief also be granted to the remaining kidnapping charge against M.S. We have little problem rejecting the argument as it applies to the kidnapping conviction. M.S. was present in court at trial and subject to cross-examination. She positively identified the petitioner as her assailant, having had ample opportunity to observe her assailant. M.S. gave a detailed description of the petitioner, including the Army fatigue jacket with patches on it which was similar to the one recovered by police in the search of petitioner's residence. Finally, M.S. was abducted just several blocks from petitioner's home and in proximity to the grocery store where Burns was seen an hour earlier.

■ The evidence presented by the State concerning the kidnapping of M.S. stands alone. It needed no help from L.L.'s identification of the petitioner at the preliminary hearing. Denial of the petitioner's right to confront L.L. had no adverse effect on the kidnapping conviction involving M.S. The error was undeniably harmless beyond any reasonable doubt as to M.S. and the conviction of Burns on the kidnapping charge must stand. We affirm the order of the district court denying the writ of habeas corpus on that count.

■ With regard to the convictions for the counts involving the crime against L.L., we must agree with the district court that the error was harmless beyond a reasonable doubt. We do not depart from *Chapman;* nor do we dilute it by inference. But under the special facts of this case, the probable impact of the preliminary hearing testimony upon the jury was only cumulative. Apart from that testimony, the physical evidence of the blood-stained jacket (stained with L.L.'s rare blood type), the similar crime committed against M.S. in the same vicinity, and M.S.'s identification at trial all constitute overwhelming evidence that would lead to the same jury determination of guilt.

The basis on which the jury decided the case was altered by the error here, but, in practice, it had no effect on the outcome. *See Rose v. Clark,* — U.S. ——, 106 S.Ct. 3101, 3107 n. 11, 92 L.Ed.2d 460 (1986). The case against Burns was not woven from circumstantial evidence. It was so overwhelming that unless we hold that no violation of the Confrontation Clause can ever constitute harmless error, we must leave this state court conviction undisturbed.

Affirmed.

CUDAHY, Circuit Judge, concurring:

This is a disturbing and elusive case which admits of a number of different approaches, all of which can lay claim to some support in the record and all of which present substantial problems of analysis as well as of policy. As I see it, the state fell short in discharging its burden of showing that L.L. was "unavailable" to appear as a witness at the trial. In my view the state failed not so much because its determination was clearly wrong but because the elements underlying the determination were stale and therefore the record support is inadequate.

Judge Evans in the district court has written a persuasive opinion demonstrating that Wisconsin committed constitutional error in failing to "meet its 'good faith' duty to procure the testimony of L.L. or to prove at the time of trial her unavailability." *Burns v. Clusen,* 599 F.Supp. 1438, 1447 (E.D.Wis.1984). Judge Evans went on, however, to hold that the admission of the preliminary hearing testimony into evidence at trial in lieu of presenting a live witness was harmless error. He reached this determination of harmlessness after a careful analysis of the purposes underlying the confrontation clause. He determined that here only the purpose that the witness be present so that the jury might observe his or her demeanor was frustrated by the use of the prior statement. And he concluded that the defendant rather than the state benefited from L.L.'s nonappearance. 599 F.Supp. 1448–50. Although I find Judge Evans' approach persuasive, it is certainly unconventional and perhaps unprecedented in focusing not apparently on the question whether admission of L.L.'s former testimony was harmless error but instead on the question whether the state's failure to present L.L. as a witness at trial was harmless error. In effect Judge Evans tried to assess the chances of a change in result if a new trial were ordered.

Judge Swygert, in a clear and well-reasoned opinion for the panel, agrees with the district court's determination that the state failed to discharge its burden of showing L.L.'s availability and thereby committed constitutional error. In this connection, both Judge Swygert and the district court face difficult problems of deference to the findings of the Wisconsin courts in resolving this basic issue. Judge Ripple, on the other hand, accords these findings a degree of deference I am unable to muster in part because the confusion or uncertainty in labeling psychiatric syndromes seems to vitiate the force of the state determinations. In any event, the error here appears to me more clearly procedural (the failure to make a *timely* assessment) than necessarily substantive. Nonetheless, I think Judge Ripple's analysis presents us with a difficult question.

I certainly agree with Judge Swygert and apparently Judge Ripple that "unavailability" presents a mixed question of fact and law as to which a federal court on a habeas corpus petition is not required to apply the 28 U.S.C. § 2254(d) presumption of correctness. But on such subsidiary questions as whether L.L. suffered from schizophrenia (long-term) or acute schizophreniform disorder (short-term) or the inferences to be drawn from L.L.'s religious behavior as an indicator of her psychiatric condition we are presumably to defer to an appropriate degree to the state courts, and perhaps here to the Wisconsin Supreme Court as opposed to the state trial court. *See Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Holleman v. Duckworth,* 700 F.2d 391, 395 (7th Cir. 1983). We are not in the same position as

Justices Heffernan and Abrahamson, who filed moving dissents to the opinion of the Wisconsin Supreme Court, written by the able and articulate Justice Day. Despite these concerns, however, I believe that, although the question is made difficult by the obligation of deference, the state failed to discharge its burden of showing "unavailability."

Although I therefore believe the state failed to meet its full obligations, I also believe that it may be appropriate here to adopt a somewhat unconventional approach to the harmless error issue or even to question the proposition that "unavailability" must invariably furnish the key to error of constitutional magnitude. The extraordinary, if not unique, circumstances of this case may permit a minor departure from the usual analysis. First, although the state failed to show that L.L. was unavailable, it is not clear to me that the defendant's rights of confrontation were significantly violated. In this regard we should examine the three purposes of the confrontation requirement: (1) that the testimony in question be under oath, (2) that there be full opportunity for cross-examination and (3) that the jury be accorded an opportunity to appraise credibility based on the demeanor of the witness. At the preliminary hearing L.L. testified under oath and was subjected to an extensive cross-examination about the events surrounding the crime and about her identification of the defendant. As Judge Evans pointed out in his district court opinion the only function of the confrontation requirement that was *not* fulfilled in this case was to allow the jury to observe demeanor. But L.L.'s credibility is apparently not at stake here. The focus of the defense was on her

ability to observe her assailant, not on her truthfulness. Her ability to observe her assailant was thoroughly probed in her cross-examination at the preliminary hearing. And, of course, the opportunity to cross-examine is the heart of the confrontation clause.[1] *See Ohio v. Roberts,* 448 U.S. 56, 63–64, 100 S.Ct. 2531, 2537–38, 65 L.Ed.2d 597 (1980); *Pointer v. Texas,* 380 U.S. 400, 406–07, 85 S.Ct. 1065, 1069–70, 13 L.Ed.2d 923 (1965) ("A major reason underlying the constitutional confrontation rule is to give a defendant charged with a crime an opportunity to cross examine the witnesses against him.")

Second, there is nothing in this case to suggest that the crime did not take place or that the defendant was misidentified as the perpetrator. Usually when we are assessing the effect on a jury of admitting improper evidence, we are not entitled to assume that that evidence could ever properly be brought before the jury. In the case before us, however, the question is in what *form* L.L.'s testimony may be presented to the jury. Had L.L. testified, she most likely would have identified the defendant as her assailant—even though one whom she would apparently forgive. In the unlikely event that she recanted her prior testimony, she could have been overwhelmingly impeached. Soon after the assault, L.L. positively identified a photograph of the defendant. She unequivocally identified the defendant as her assailant at the preliminary hearing, and her identification withstood thorough cross-examination. Even L.L.'s letters and visits to the defendant in jail only tend to confirm his role as the perpetrator of the crime. Finally, the state would undoubtedly point to her reli-

1. Wigmore comments:
   The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.
   That this is the true and essential significance of confrontation is clear, from the lan-

   guage of counsel and judges from the beginning of the hearsay rule to the present day: [Wigmore quotes numerous authorities at length.] Thus the main idea in the process of confrontation is that of the opponent's opportunity of cross-examination; the former is merely the dramatic feature, the preliminary measure, appurtenant to the latter.
   J. Wigmore, V Evidence § 1395 at 150–52 (1974).

gious convictions to explain her recantation.

Third, the issue of unavailability turns on a difficult appraisal of the mental illness of the victim. The extent and duration of a witness's mental illness—and the effect of having to testify against an assailant—are often difficult to determine and in this case seem to have presented particularly troubling and close questions. The difficulty of these issues is evidenced by the confusion and uncertainty about the labels "schizophrenia" and "acute schizophreniform disorder". Even though L.L. may have been "available," her psychiatric history indicates a risk of psychological trauma if she had testified. And the state does have a legitimate interest in protecting L.L.'s mental health. When the issue is as close as this one, when an appraisal of serious mental illness is involved and when the basic facts indicating guilt seem not really to be in controversy, I do not believe that the use of an earlier sworn and cross-examined statement must necessarily result in error of constitutional magnitude. Or, if there is constitutional error, it is harmless. The district court, following an analysis very much like my own, concluded that the error here was harmless. *Burns v. Clusen*, 599 F.Supp. 1438 (E.D.Wis.1984). Judge Swygert, pursuing a more orthodox approach, reaches the same conclusion. Certainly infringements upon the confrontation clause are not to be taken lightly. But the extraordinary circumstances existing here argue, on balance, against the grant of a writ of habeas corpus.

RIPPLE, Circuit Judge, concurring.

In my view, this case should not be decided by inventing novel approaches to the confrontation clause which will provide dangerous precedent in future cases. Nor should it be decided by invoking the harmless error rule. Such a course would undoubtedly send the wrong signal with respect to this court's tolerance of serious error to the trial courts and to those officials of the federal and state government charged with the prosecution of criminal offenses. Rather, this case should be decided by the forthright adherence to the basic principles governing the role of the federal courts in habeas corpus actions.

In *Sumner v. Mata*, 449 U.S. 539, 545–46, 101 S.Ct. 764, 768, 66 L.Ed.2d 722 (1981) (*Sumner* I), the Supreme Court held that the presumption of correctness accorded the findings of fact of state courts under 28 U.S.C. § 2254(d) (1966) extends to findings of fact of the appellate courts of the state when those findings of fact are contained in the court's written opinion. *See also Love v. Young*, 781 F.2d 1307, 1310 (7th Cir.1986) (*per curiam*). This holding was reaffirmed by the Court in *Sumner v. Mata*, 455 U.S. 591, 592–93, 102 S.Ct. 1303, 1304–05, 71 L.Ed.2d 480 (1982) (*per curiam*) (*Sumner* II). This presumption does not apply to conclusions of law. *Cuyler v. Sullivan*, 446 U.S. 335, 341, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). Nor does it apply to "mixed" questions of fact and law. *Sumner II*, 455 U.S. at 597, 102 S.Ct. at 1306. On the other hand, it does apply not only to the facts explicitly found by the state courts but also to the inferences fairly deducible from those facts. *Marshall v. Lonberger*, 459 U.S. 422, 435, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983). In this case, the conclusion of the Supreme Court of Wisconsin that the prosecutrix was "unavailable" is probably a mixed question of law and fact and not entitled to the deference mandated by section 2254(d). *See Miller v. Fenton*, —— U.S. ——, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *but see Maggio v. Fulford*, 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983). However, in any event, this conclusion is based on the Wisconsin Supreme Court's finding that "the victim is presently diagnosed as being severely mentally ill" and that "the act of testifying again has a significant probability of worsening the condition." *State v. Burns*, 332 N.W.2d 757, 764 (Wis.1983). This finding is in turn based on more detailed findings:

> Dr. Busby testified that L.L. presently suffered from schizophrenia, a severe mental illness, and would continue to suffer from the illness for two years or more. He also testified that requiring

L.L. to testify at trial had a moderate to high probability of causing her to suffer a relapse. The symptoms L.L. originally suffered included being in a "catatonic stupor with hallucinations and delusions." He further testified that schizophrenia was known for the difficulty which patients experienced in recovering from it.

\* \* \* \* \* \*

The victim in this case became a catatonic schizophrenic, after her preliminary examination testimony, as a result of the vicious assault upon her. We are not capable of understanding all the mechanisms the mind uses to cope with the seemingly unbearable. Calling on Jesus Christ to save her during her struggle, she continued to call on him during her hospitalization as she apparently relived the horror of her brush with death. Following slight improvement in her situation, she now seeks refuge in her religion from the haunting shadows of her experience. She is trying to "convert" her attacker, hence her pitiable letter and visit to him in the jail and also her feeling she shouldn't testify, treating this heinous crime as something between her and the defendant and outside the concern of the court.... One cannot forget that her forgiveness here is the product of a mind rendered seriously ill due to the defendant's assault upon her.

*Id.* at 762, 765.

Based on this evidence, the Wisconsin Supreme Court concluded that the victim was suffering from a long term mental illness. *Id.* at 761 n. 6. The Supreme Court's holdings in *Sumner I, Sumner II* and *Wainwright v. Goode,* 464 U.S. 78, 83, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983), require us to apply the section 2254(d) presumption to this finding.

It is clear that these findings of fact were not unanimously accepted by the justices of the Supreme Court of Wisconsin. Two distinguished members of that court believed that the record revealed that the condition of the prosecutrix may have been significantly improved by the time of trial and that, consequently, she was not "unavailable." The fact that these distinguished jurists disagreed on the appropriate findings does not alter the role of this court. We do not sit as a court of appeal and error over every determination of the Supreme Court of Wisconsin. That tribunal did resolve the matter and, as long as that determination is fairly supported by the record, it is not our place to second-guess that tribunal. Here, my own examination of the record convinces me that there is indeed an adequate basis for the finding of the majority. As in the case of most psychiatric testimony, absolute clarity is not apparent and it was necessary for the state court to evaluate the testimonial submission in its totality.[1] However, the state court undertook that task and we must accept its conclusion. *Goode,* 104 S.Ct. at 382–83.[2] The record fairly sup-

---

1. For instance, the Wisconsin court carefully evaluated apparent discrepancies in medical terminology:

   In the record, Dr. Busby initially testified that L.L. suffered from schizophrenia. He later identified the disorder as an acute schizophreniform disorder. However, the record clearly shows that he expected the recovery period to last a minimum of two years and such a recovery period is consistent with a diagnosis of schizophrenia but not acute schizophreniform disorder. See Diagnostic and Statistical Manual of Mental Disorders (3rd Ed.1980).

   *State v. Burns,* 332 N.W.2d 757, 761 n. 6 (Wis. 1983).

2. In *Wainwright v. Goode,* 464 U.S. 78, 83, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983), the Court reversed an Eleventh Circuit decision to grant a petition for habeas corpus. Mr. Goode had filed a petition for a writ of habeas corpus in the Florida Supreme Court. He claimed that he had been denied effective assistance of counsel because his attorney on appeal had failed to challenge the trial judge's reliance on a nonstatutory aggravating factor when the judge sentenced him to death. The Florida Supreme Court reviewed the record and determined that the trial judge had not relied on an improper factor. *Id.* 104 S.Ct. at 381. The Eleventh Circuit evaluated the record and decided that the trial judge had considered a nonstatutory aggravating factor. The Supreme Court concluded that the record in the trial court was at best ambiguous. However, because both possible characterizations of the trial court's action "find

ports the conclusion that the prosecutrix was suffering from a long-term mental illness with little or no chance of significant improvement in the short or intermediate term.

The finding that the prosecutrix was suffering from a long-term mental illness is fairly supported by the record. Therefore, we cannot substitute our findings or the findings of the minority of the Wisconsin Supreme Court. *Goode*, 104 S.Ct. at 383. Bound by the findings that the witness suffered a mental illness which would likely continue for two years and that requiring her to testify could cause a relapse, I would find no violation of the confrontation clause and would affirm the judgment of the district court.

fair support in the record, ... [the Supreme Court believed that] the Court of Appeals erred in substituting its view of the facts for that of the Florida Supreme Court." *Id.* at 383.